C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

---

\*C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

(*Jackson.* June 30, 1893.)

1. Chancery Court.   *Complainant must have clean hands.*

It is a maxim of Courts of Equity, applicable in the consideration of cases brought to prevent the unlawful infringement of trade-marks or unfair competition in business, that the complainant seeking the Court's interposition in his behalf must come with clean hands; and that he will be repelled at the threshhold of the Court, if it appear from the case made by him, or by his adversary, that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud.   (*Post, p. 94.*)

Cases cited: 8 Sim., 477 (R. Cox, 640); 2 Sandf. Ch. Rep., 662 (R. Cox, 72); 19 How. Pr., 567 (R. Cox, 287); 5 Phila., 464 (R. Cox, 307); 108 U. S., 28; 33 La. Ann., 946; 8 Mo. App., 277.

2. Same.   *Same.   Defense good without pleading.*

And this defense is available without pleading.   (*Post, pp. 98, 99.*)

Cases cited: 13 How. Pr. R., 38 (R. Cox, 180); 128 Mass., 477.

3. Trade-mark.   *Conduct that will not repel complainant seeking to restrain unlawful infringement.*

Issuance of a large number of copies of a single false circular, eight years before an action to restrain the use of a certain package for sale of medicine is brought, and forty years after the business is established, is not such deception as will disentitle the plaintiff to relief.   (*Post, pp. 93, 94, 99, 100.*)

Case cited: 14 Blatch., 262.

---

\* There is a note fully reviewing the authorities on the question of the invalidity of a deceptive trade-mark published with the case of *Joseph* v. *Macowsky* (Cal.), 19 L. R. A., 53.—Reporter.

C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

4. SAME. *Same.*

A statement on a package of medicine: "Trade-mark registered, consisting of name, picture, and autograph," in a designated year, in which there was no provision for registration of trade-marks, by one who had filed a book title in that year showing his connection with the business, is not such a misrepresentation, when made without fraudulent intent, as will disentitle him to relief in an action to restrain the use of a similar package. (*Post, pp. 94, 100–102*).

5. SAME. *Same.*

A statement on a package of medicine that "this is the original and only genuine Simmons' Liver Medicine," when made in good faith, will not disentitle one to relief in an action to restrain the use of a similar package, although there are other preparations from the original formula, if they are known under another name. (*Post, pp. 94, 102–105.*)

6. SAME. "*Simmons' Liver Medicine*" *is not.*

The use of the term "Simmons' Liver Medicine" cannot be appropriated by one person as a trade-mark, where it has become merely descriptive of medicine prepared under an original formula, and used by many people in connection with such medicine. (*Post, pp. 118, 119.*)

Cases cited and approved: 138 U. S., 537; 13 Wall., 311; 52 Wis., 572.

7. UNFAIR COMPETITION IN BUSINESS. *Enjoined, when.*

The use of a package for medicine so closely resembling that already appropriated by another as to deceive an ordinary observer, and employed for that purpose, will be enjoined, although the differences between them are readily seen when they are placed side by side. (*Post, pp. 119–146.*)

Cases cited: 39 Fed. Rep., 777; 2 Keen, 213; 2 Bos., 1; 81 Ky., 75; 23 Fed. Rep., 275; 26 Fed. Rep., 410; 24 Fed. Rep., 149; 7 Beav., 84; 138 U. S., 537; 43 Fed. Rep., 800; L. R., 41 Ch. Div., 35–50; 139 U. S., 540; 10 Fed. Rep., 838.

8. LACHES. *Does not bar account for infringement of trade-mark, when.*

A delay of one year to begin an action to restrain the use of a package for medicine as an infringement of the plaintiff's trade-mark, is not such laches as will disentitle him to an accounting, especially where he made immediate complaint thereof. (*Post, pp. 146, 147.*)

C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

Cases cited: 6 L. R. A., 824; 20 Fed. Rep., 217; 27 Fed. Rep., 24; 96 U. S., 245.

FROM SHELBY.

Appeal from Chancery Court of Shelby County. W. D. BEARD, Ch.

TAYLOR & CARROLL, LEE & ELLIS, PHILLIPS, STEWART & CUNNINGHAM for Complainants.

GANTT & PATTERSON and TURLEY & WRIGHT for Defendants.

M. M. NEIL, Sp. J. Prior to the year 1840, one A. Q. Simmons, a farmer in Walker County, Georgia, having come into possession, in some manner not clearly disclosed by the proof, of a secret formula for the making of a valuable liver medicine, was accustomed to prepare it in small quantities for use in his own family and in the families of his neighbors. It does not satisfactorily appear that he made any for sale.

In 1840, or about that time, one M. A. Simmons, a young physician, and son of A. Q. Simmons, being at his father's house, they conceived the idea of preparing the medicine together for market. The two together made up the first lot of it for sale, M. A. Simmons, with his father's assistance, writing the first prescription or direc-

tions.   This first lot was made in liquid form, and put in a five gallon keg, and carried through the country in a buggy, and retailed in quantities to suit the purchaser, by M. A. Simmons and his father.   After making a few trips like this through the country, M. A. Simmons decided to return to his home in Dade County, Georgia, where he had previously begun the practice of medicine, and it was agreed between him and his father that they would make and sell the medicine separately, the father operating from his home and the son from his.   The father continued to manufacture and sell this medicine from Walker County, Georgia, until the year 1856, when he moved to the State of Texas, and there died in the year 1862.   About the year 1842, the son, Dr. M. A. Simmons, moved to the State of Mississippi, and there continued the manufacture and sale of the medicine.   He advertised the medicine considerably both in newspapers and almanacs, calling attention to his own and his father's make.   It does not appear that A. Q. Simmons ever advertised to any extent, if at all, separately from the advertisements prepared and put forth by Dr. M. A. Simmons.   At this early date the medicine put forth by Dr. A. Q. Simmons (he having acquired the title in the manufacture of the medicine), was labeled thus: "Liver Medicine by A. Q. Simmons," all in print. That put forth by Dr. M. A. Simmons was labeled thus: "Liver Medicine by M. A. Simmons," the name being written in script.

On the eleventh day of November, 1843, Dr. M. A. Simmons deposited in the Clerk's office of the District Court of the United States for the District of West Tennessee, the title to a book, as follows: "Dr. Simmons' Vegetable Liver Medicine, prepared solely by A. Q. Simmons & Son, Walker County, Ga.," and obtained a certificate in his own name of this fact. In the year 1850, he began to use a label, consisting of his picture and autograph, and the name, "Dr. Simmons' Vegetable Liver Medicine," and a statement of the ailments for which it would be found useful.

On the seventeenth day of October, 1856, Dr. A. Q. Simmons gave to his son, C. A. Simmons, a paperwriting, authorizing him to "make all my medicines, and to use my name in preparing, selling, and advertising all of my medicines," etc., A. Q. Simmons having been the manufacturer of other medicines also, besides the "Liver Medicine." Immediately after this authority was given him, he began to manufacture under it, and manufactured and sold under it continuously, except for a short period during the Civil War, when he could not get the material, down to 1868. From 1856 down to 1865, he called his preparation "Dr. C. A. Simmons' Liver Medicine," but in 1865, he gave it the name, "Dr. Simmons' Liver Regulator," and sold it in that name until 1868.

On the thirtieth day of September, 1868, C. A. Simmons sold his certificate, together with a knowledge of the formula for the making of the liver

remedy, to defendants, J. H. Zeilin & Co. After their purchase, and during the year 1868, they added to the name of the preparation the words "or medicine," and on the tenth day of December, 1868, in the District Court of the United States for the Southern District of Georgia, "deposited the title of an engraving," consisting of a label containing the words, "Dr. Simmons' Liver Regulator or Medicine," with a statement of the diseases for which the remedy was thought to be useful, and the words, "A strictly vegetable, faultless family medicine, prepared only by J. H. Zeilin & Co., Macon, Ga."

In 1868 or 1869, after Zeilin & Co.'s purchase, Dr. M. A. Simmons changed his label so as to read, "Dr. M. A. Simmons' Vegetable Liver Medicine," the change consisting in the insertion of the initials "M. A." to distinguish his preparation of the remedy from that of Zeilin & Co.

On November 1, 1870, Zeilin & Co. registered in the patent-office at Washington, a "wrapper or label or a trade-mark for said medicine," being an exact copy of that previously filed in the United States District Court for the Southern District of Georgia. It should be noted, however (a fact not previously mentioned), that both of said wrappers also contained the following caution: "Owing to the imitations and counterfeits of this valuable medicine, we are compelled, at a great expense, to change to this style of wrapper. None genuine without it, and the signature of A. Q. Simmons," the name of J. H. Zeilin & Co. being written in

red ink across the face of this "caution," and
below it their monogram in red ink. Each label
also contained, at the top, a triangular shaped space
inclosed in black lines, to be folded over the top
of the package, and in this space the words, "Di-
rections inside for preparation and use," and a
similar triangular space at the bottom, to be folded
over the bottom of the package, and in which
were printed the words: "Entered, according to Act
of Congress, in the year 1868, by J. H. Zeilin &
Co., in the Clerk's office of the District Court of
the United States for the District of Georgia."

On March 10, 1874, Dr. M. A. Simmons regis-
tered his trade-mark in the patent-office at Wash-
ington, with the following specifications: "My trade-
mark consists of the words, 'Dr. Simmons' Vege-
table Liver Medicine' placed on a label above a
portrait of myself, and a fac-simile of the signature,
'M. A. Simmons, M D.,' on the lower part of the
label at the right hand, as represented in the ac-
companying drawing," said drawing being a dupli-
cate of the label upon his tin can packages in
use in 1850. He continued however, in actual use
the variation of this form introduced by the in-
sertion of the initials "M. A.," the actual name
appearing on all the packages being "Dr. M. A.
Simmons' Vegetable Liver Medicine." And it has
also been most generally advertised by this name,
both by him and his successors in title, but very
often by the name "Dr. M. A. Simmons' Liver
Medicine."

On the seventeenth day of May, 1881, J. H. Zeilin & Co. registered in the patent-office at Washington, an addition to the "trade-mark," consisting of a device representing a mortar and pestle crossed by a scroll or ribbon, in the form of the letter "Z," one end of which embraces a spatula and the other end a graduate. On the several limbs of this symbol are arranged the words "A. Q. Simmons' Liver Regulator." And on the twenty-fourth day of May, 1881, they registered, also in the patent-office at Washington, a claim to the exclusive use of the word "Simmons" as a "word-symbol," claiming that it had "lost its original signification, and become a purely arbitrary term, indicating origin and ownership, by pointing to us as the manufacturers of the genuine preparations." They have continued this form of label down to this time, the "Z" being a large, red letter on the front face of the label, and the words, "A. Q. Simmons' Liver Regulator," being in white letters, on the limbs of said red letter Z.

Up to 1878, Dr. M. A. Simmons manufactured his medicine principally at Iuka, Mississippi, but in that year moved to St. Louis, Missouri, where he prosecuted the business until 1879, when he sold to Simmons & Hayden, his business, including his "trade-mark," cuts, dies, and labels, and thence the said business, "trade-mark," cuts, dies, etc., passed by proper transfers to the complainant, "C. F. Simmons Medicine Company," which has

been conducting the business in ,St. Louis ever since. J. H. Zeilin & Co. began the business of manufacturing their "Regulator or Medicine" in Macon, Ga., but in 1872 removed to Philadelphia, Penn., and after that time did business continuously at Philadelphia, until they transferred their business to "J. H. Zeilin & Co., Incorporated," a. corporation chartered under the laws of the State of Pennsylvania, which corporation has since been carrying on the business at the same place, and has been brought into this case by supplemental bill, and · answers, assuming all responsibility con- nected with this litigation.

Within a few months after J. H. Zeilin & Co.'s purchase from C. A. Simmons, a fierce rivalry sprang up between that concern and Dr. M. A. Simmons, and has been continued by them and their successors, down to this time. This warfare· has been waged in newspapers and circulars, and has been very bitter and mutually abusive. It would serve no good purpose to go into this. matter more particularly. Suffice it to say, that neither has secured much advantage over the other· in the use of hard names and injurious epithets..

The culmination of this rivalry and bitterness. was the present litigation. On the twenty-third. day of January, 1891, the complainant filed its orgi- inal bill against J. II. Zeilin & Co., I. L. Corse,. T. F. Cheek & Co., and the Mansfield Drug Co., in which bill, among other things disposed of by the Chancellor and not appealed from, and hence

not necessary to notice here, they sought to restrain the defendants from vending a certain package known in this record as the " Cheek package," and for a destruction of the labels, packages, devices, etc., connected therewith, and for an account of profits.  To this bill the defendants, filed their answer and cross-bill; and in said cross-bill defendants asked that complainants in the original bill be restrained from using a cartoon of like form and size to that used by complainants in the cross-bill; that complainants in the original bill be restrained from using red or reddish gold borders within slight black lines on its package; that it be restrained from using red tablets or reddish gold tablets across its packages; that it be restrained from using triangular shaped flaps on the ends of its packages, bounded by broad red or reddish gold lines, inclosed in slight black lines; that it be restrained from using the words, "full directions inside," within the triangular shaped flap at the bottom of its packages; that it be restrained from putting any matter within the triangular shaped flap on the top of its packages; that it be restrained from putting up its medicine in liquid form; and for an order of reference to ascertain the amount of damages which complainants in the cross-bill may have sustained by reason of the infringement of their trade-mark rights.

But before proceeding to a consideration of these matters, it is necessary to first dispose of a preliminary question made by the defendants.  It is

said that the complainants do not come into Court
with clean hands, and should be therefore repelled
at the threshold of a Court of Equity, because the
proof shows that complainants had put out a cir-
cular, entitled "Humor and Facts," and sent it
broadcast to the trade, in which circular the claim
was made that Dr. M. A. Simmons was the dis-
coverer of the remedy; also because the triangle on
top of complainants' packages contains the following :
" Trade-mark registered, consisting of name, picture,
and autograph, November 11, 1843 ; " and also be-
cause each package issued by the complainants
contains the following statement, viz. : " This is
the only original and genuine Simmons Liver Medi-
cine."

The principle is general, and is one of the
maxims of the Court, that he who comes into a
Court of Equity asking its interposition in his be-
half, must come with clean hands; and if it appear
from the case made by him, or by his adversary,
that he has himself been guilty of unconscientious,
inequitable, or immoral conduct, in and about the
same matters whereof he complains of his adversary,
or if his claim to relief grows out of, or depends
upon, or is inseparably connected with his own
prior fraud, he will be repelled at the threshold
of the Court. Some applications of this principle
to the special class of cases we have under con-
sideration, will be seen in the following excerpt,
taken from Browne on Trade-marks: "Where a
complainant had in his advertisements made a num-

ber of false representations to the public, with respect to the origin, composition, and value of the tea bearing his trade-mark, an injunction was refused until he had established his right at law, Vice Chancellor Shadwell saying, 'It is a clear rule laid down by Courts of Equity, not to extend their protection to persons whose case is not founded in truth.' The rule applies when one has made misrepresentations in show cards; or made false statements as to the qualities and properties of his merchandise, as in selling a medicine misnamed 'Balsam of Wild Cherry,' or a toilet compound the labels of which contained untrue statements and exaggerations, or a cosmetic called "The Balm of Thousand Flowers," though the compound was not derived from flowers, or "Laird's Bloom of Youth or Liquid Pearl," when the so-called article contained carbonate of lead or other noxious ingredients, although the manufacturers described it as being free from all mineral and poisonous substances; or improperly represented that "Schnapps" is not merely a spirit, but also a medicinal preparation; or sold a so-called "Hop Essence" for the purpose of enabling brewers to supply to the public a liquid which they might represent as made with pure hops, which was not the truth; or made false representations of the origin and value of the plasters, the word "Capcine" being shown to be quite unknown, and not to imply any such qualities as were described by the plaintiffs; or falsely representing the place of manu-

facture, as where the manufacturer of a skin powder, which he called "Meen Fun," falsely represented his American compound to have been made in England and patronized by the Queen; or misrepresented his cigars as having been made in Havana; or falsely denoted or indicated to the public, in the title of his merchandise, that the formula for his medicine was prepared in the East Indies; or untruly represented the place of origin as well as the manufacturer; or continued the name of a predecessor after he had ceased to be connected with the business. But it must be remembered that in all the above cases, fraud was a predicate. Where no actual or constructive fraud is shown, and no intention to harmfully mislead purchasers manifested by the use of instrumentalities that would naturally tend to that result, the rule does not apply." Browne on Trade-marks, Sec. 71; and see *Pidding* v. *How*, 8 Sim., 477 (R. Cox, 640); *Partride* v. *Menck*, 2 Sandf. Ch. Rep., 662 (R. Cox, 72); *Hobbs* v. *Francais*, 19 How. Pr., 567 (R. Cox, 287); *Phalon* v. *Wright*, 5 Phila., 464 (R. Cox, 307); *Manhattan Medicine Co.* v. *Wood*, 108 U. S., 28.

So, where the question arose as to the untruthful use of the word "patent" or "patented," it is said: "In all the foregoing cases a fraudulent intention, or a tendency to mislead, was the ground of decision; but the untrue use of the word "patent," or an equivalent expression, does not necessarily disentitle to relief. Intent, or a tendency to mislead, is, after all, a question of fact, to be determined

by the circumstances of each individual case." *Ib.*, 87. And again: "In the Supreme Court of Louisiana it was held that the use of the word 'patented' must be with the purpose of deceiving the public, to be a valid objection; and if a fraudulent intention does not exist, and the use of the word may be explained in any reasonable sense consistent with truth and honesty, the party will not be prejudiced." *Ib.*, 88; *Insurance Oil Tank Co.* v. *Scott*, 33 La. Ann., 946; Price & Stewart, American Trademark Cases, 477. So, where the words adopted in the label as a trade-mark are substantially true, and contain nothing calculated to deceive the public, although not literally true, this was held to be a distinction without a difference, and not sufficient to repel the plaintiff. *Conrad* v. *Joseph Uhrig Brewing Co.*, 8 Mo. App., 277. The words complained of were, "Budweiser Lager Beer." "It is contended that the law can afford no protection to plaintiff, because his so-called trade-mark or label was in itself a misrepresentation. This beer, it is said, was not Budweiser beer. That it was not Budweiser beer in the sense that it was not made in Budweis is true. Neither was it imported beer. But it does not appear that it was held out to the public, either as actually made in Budweis or as a foreign article. The statement on the label explains that it was not made at Budweis, but by the Budweiser process. Whether there was anything peculiar to Budweis about this process or not, it seems that this beer was really made as

7—9 P

beer made in Budweis—of the best barley and hops, and with the same preparation of mash. The label states that it was made of the best Saazar hop and imported barley. If this was not literally true, the testimony is that it was a distinction without a difference. Imported hops exclusively were used. There were frequently other hops, but they were always of the same excellent quality as Saazar hops, and of the same peculiar properties, and were always imported hops. The barley was not imported, but a select quality of American barley, equal to imported barley, was always used. There was no testimony tending to show any imposition upon the public by plaintiff. The testimony is that the public was furnished by him with an excellent quality of beer, made of imported hops, and of barley equal to any to be found in Europe or America." *Ib.;* Price & Stewart, American Trade-mark Cases, 322.

It is true, as insisted by complainant, that this objection is not set up in defendant's answer in the case at bar. Nor was that necessary. In the case of *Fetridge* v. *Wells*, 13 How. Pr. R., 385 (R. Cox, 180), where this question arose in a similar case, said Duer, J.: "The remarks that I have now made would suffice for the decision of this motion, were the only question that of the similarity of the trade-marks, but there is another, and a grave and important question, to which the counsel for the defendants have earnestly directed my attention. That question is, whether, even upon

the supposition that all the material allegations in the complaint are true, the conduct and proceedings of the plaintiff and his firm have not been such as justly to preclude them from any claim to relief in a Court of Equity. This question, it is true, is not raised in the answer of the defendants, but it is raised by the facts which the affidavits and other papers before me have disclosed, and, in my opinion, it is emphatically the question that, as a Judge in equity, I am bound to consider and determine." And in *Connell* v. *Reed,* 128 Mass., 477, the fraud was first disclosed in the report of the Master upon the subject whether there had ever been a former use of the trademark in controversy, and when this report came in containing the information that the plaintiff had adopted and used the words, "East Indian," to denote and to indicate to the public that the medicines were used in the East Indies, and that the formula for them was obtained there, neither of which was the fact, the Court declined to entertain the proceedings further, saying: "Under these circumstances, to maintain this bill would be to lend the aid of the Court to a scheme to defraud the public." Price & Stewart, American Trade-mark Cases, 347. It is not, strictly speaking, a defense at all, but rather an interposition by the Court in behalf of the public, to discourage fraud and wrong upon the public.

Applying the rule above illustrated to the facts of this case, we think that there is no doubt that

the statement made in "Humor and Facts," that M. A. Simmons was the discoverer of the medicine, or formula, being false, and being known to be false, and material, would disentitle complainants to any relief, if otherwise entitled, but for the fact that this statement was not made after the year 1883. It is certainly true, that where a business has been built up on the publication of a particular falsehood for a considerable time, as in *Seabury* v. *Johnson*, 14 Blatch., 262 (Price & Stewart, 29), the omission of such fraudulent and untrue language from circulars before bringing suit, will not relieve the plaintiff of the consequences of the previous wrong; but we do not think this rule should be applied to a single circular, issued in one particular year, eight years before suit brought, although a very large number of copies of that circular were issued in that year, especially in view of the fact that this publication occurred simply as one incident in a long career of a previously established business reaching back more than forty years.

As to the statement on complainant's packages, "Trade-mark registered, consisting of name, picture, and autograph, November 11, 1843;" while this was not and could not be true, we do not think that it was intended thereby to mislead the public as to any material matter, or that it did so mislead the public. This statement must be understood in the light of the controversies that have been waged between complainants and defendants for many years past. As soon as Zeilin & Co.

got possession of the formula from C. A. Simmons, and began the manufacture of their "Dr. Simmons' Liver Regulator or Medicine," a controversy sprung up as to who had the right to make the medicine. Zeilin & Co. claimed that, as assignee of C. A. Simmons, the only person, as they insisted, who had received authority from Dr. A. Q. Simmons, they had the sole right; M. A. Simmons insisted that he was one of the original proprietors. In this state of the case, M. A. Simmons thought it necessary to hold up before the public the fact of his early connection with the making of the medicine—that as far back as 1843, he had publicly asserted a proprietorship in the medicine. This he had in fact done by the filing of the book title, before referred to, November 11, 1843, under the copyright law, in the office of the Clerk of the District Court of the United States for the District of West Tennessee, and receiving from the Clerk a certificate in his own name, showing that he had so filed it, the title so filed being "Dr. Simmons' Vegetable Liver Medicine, prepared solely by A. Q. Simmons & Son, Walker County, Ga." The statement on the package is intended to call attention to this cardinal fact, the early connection of Dr. M. A. Simmons with the medicine as a proprietor, and, so understood, states the truth. The statement in other respects is wholly immaterial and unmeaning, because in 1843 there was no provision for registry of trade-marks, and the statement in this respect was merely the

statement of an absurdity, and innocuous. The
copyright law under which the so-called registra-
tion of 1843 was made, had no application to
trade-marks, and gave them no protection. Browne,
Trade-marks, Secs. 109–112. The first attempt by
Congress to regulate the right in trade-marks, is
to be found in the Act of July 8, 1870. Browne,
Trade-marks, Sec. 280. Under this Act, Dr. M. A.
Simmons did register his trade-mark, "consisting
of name, picture, and autograph," in 1874, as be-
fore stated, and at the time said statement on his
packages was first put forth, the registration allowed
by that Act had been made. That Act was de-
clared unconstitutional in 1879, by the Federal
Supreme Court. Trade-mark Cases, 100 U. S., 82,
99. We do not think that the complainants should
be repelled on account of said statement, for the
reason that, so far as it contains any suggestion of
untruth, it is immaterial, absurd, and innocuous.

As to the next statement upon complainant's
package animadverted upon by the defendants, that:
"This is the original and only genuine Simmons'
Liver Medicine, the first that was ever advertised
of that or any similiar name. Dr. M. A. Sim-
mons advertised it extensively, peacefully, and
alone for twenty-five years, before any of the
others who are now making the different grades
or imitations of it commenced. No other Sim-
mons ever did so," etc. This is substantially cor-
rect in its statement as to advertisement, and the
maintenance of the reputation of the medicine,

and as to its being original in the sense of being made from the original formula, and by one of the original proprietors, but it is not correct as to complainant's preparation being the only genuine preparation made from the original formula, because the proof makes it clear that the preparation made and sold by Zeilin & Co. is equally genuine with complainant's, in the sense of being made from the same original formula. Was this misstatement made fraudulently? We think not. However mistaken M. A. Simmons was in his opinion, the record shows that he honestly believed that, as one of the original proprietors, he was entitled to the secret of the preparation, and he alone after the death of his father in 1862. He always passionately denied the right of Zeilin & Co. to use the word " Medicine," making no objection to the use of the word " Regulator " He seemed never to be convinced of the fact that his father had communicated the formula to C. A. Simmons. He dwelt upon the fact that C. A. Simmons had sold what purported to be the original formula to one Guice, and that the medicine made up by Guice according to this formula had proven inert and worthless, and he argued from that, that Zeilin & Co., having purchased from C. A. Simmons, had gotten the same imperfect formula that he supposed C. A. Simmons to have. He even went so far as to offer in a letter to J. H. Zeilin himself, dated October 8, 1877, to teach him how to prepare the medicine correctly, when he

and Zeilin were having some correspondence about the sale of M. A. Simmons' business to him. The letter runs thus : " Your favor of the third instant is here. Knowing your ignorance of the party addressed, I overlook the part which seems designed to intimidate, and come at once to the question, What is best for us to do ? I have been for several years in hopes of getting into Court with you—would when you first commenced, but had no idea you could so completely undermine and get my business, until it was done. Then, you were in Philadelphia, too far for me to go so often annually, and probably so long to attend Court. Now, as proof that I am pursuing the proper course, it is successful. My business has been constantly increasing for several years, and I am satisfied that it will continue to increase. My prospects are better now than ever since your monopoly of newspapers. Yet, I prefer quiet and peace, and would like to rest from exciting business in my old age, therefore would sell to you— *learn you how to make it right*—quit it entirely, and run other preparations," etc. He and his successors also attached the greatest importance to the word " Medicine " in the title of their preparation, because it bore that designation as prepared under the original formula by M. A. and A. Q. Simmons when they made it up and sold it themselves, and the word " Medicine " in that connection had acquired in the minds of the people supplied by M. A. Simmons, a peculiar meaning, and appertaining

to the old medicine as originally prepared, and connecting it back with the old formula. So that when M. A. Simmons and his successors used the expression "original and only genuine Simmons' Liver Medicine," it bore in their minds, and was intended to convey two ideas, direct descent, so to speak, in formula and in name, from the ancient original; and this was honestly believed by them to be true. We cannot impute fraud on such a state of facts. We cannot hold this to be a deliberate purpose to deceive the public. This statement is not true in the sense of being the only genuine preparation from the original formula; it is true in the sense of being the only preparation, so far as the proof shows, that continues the ancient name with the ancient formula.

Recurring now to a consideration of the substantial rights of the parties in litigation in this case, we are brought to a discussion of the "Cheek" package and the rights predicated thereon. The antecedents of this package are as follows: T. F. Cheek, being a son-in-law of old Dr. A. Q. Simmons, and having gone with him to Texas, and there resided part of the time in his family, and part of the time a few miles distant, claimed to have received, in 1857, authority from Dr. A. Q. Simmons to make all of his medicines, and to use his picture as a protection against frauds and imitations. After the close of the Civil War, and about the year 1870 or 1871, Cheek decided to leave Texas and remove to Alabama or Mississippi.

Before leaving Texas, he endeavored to purchase from A. Q. Simmons, Jr., the right to use his name in connection with the manufacture of the liver medicine. A. Q. Simmons, Jr., refused to comply with this request. Cheek then approached A. W. Simmons, another son of Dr. A. Q. Simmons, and for a consideration of fifty dollars secured from him permission to use his name in connection with the manufacture of said medicine. Thus armed, Cheek went to Iuka, Miss., where Dr. M. A. Simmons was engaged in manufacturing and selling the medicine. He suggested to Dr. M. A. Simmons that there should be a combination of all the heirs of Dr. A. Q. Simmons in the manufacture of the medicine. This was declined. He, however, manufactured a small quantity of the medicine on his own account, Dr. M. A. Simmons ordering the materials for him; and he, said Cheek, sold it in an inconsiderable quantity around the neighboring towns and country for a short time. About this time he registered his trade-mark in the office of the Librarian of Congress at Washington—a photograph of Dr. A. Q. Simmons; and on the thirty-first of December, 1872, having in the meantime removed to Birmingham, Ala., he deposited in the same office a print, entitled "Simmons' Improved Liver Medicine," and on December 4, 1877, he received a certificate from A. R. Spofford, Librarian of Congress, to the effect that he had deposited in that office a photograph of Dr. A. Q. Simmons, accompanying the certificate with the title, "Simmons'

C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

Improved Liver Medicine: By T. F. Cheek, of Birmingham, Ala." After he went to Birmingham, he there manufactured liver medicine and sold it in a small way, using a wrapper for his packages on one face of which appeared a picture of Dr. A. Q. Simmons—that is, a bust of him—with the words "trade-mark," one of these words appearing on each side of the picture. Above this picture was a notice of the entry in the office of the Librarian of Congress, before referred to, and under it the following: "The celebrity of Simmons' Liver Medicine and the constantly increasing demand, has induced sundry persons to counterfeit it. Hence, it becomes the duty and privilege of the heirs of Dr. Simmons to sustain and increase its usefulness by such improvements as are demanded by medical progress, and to secure accuracy in purchasing. Therefore, information is given that Simmons' Liver Medicine has been greatly improved, and hereafter every package will have the engraving of Dr. Simmons and signature of T. F. Cheek, to whom all orders and communications must be addressed, at Birmingham, Ala." On another face of said wrapper was the following: "Simmons' Improved Liver Medicine, a safe and effectual remedy for all diseases arising from a diseased state of the liver, such as chronic and acute inflammation of the liver, dyspepsia, bilious affection, dropsy, sick headache, costiveness, impure blood, jaundice, colic, loss of appetite, low spirits, despondency, flatulence, female weakness, and general debility. Warranted purely

vegetable by A. W. Simmons & Co., heirs of Dr. A. Q. Simmons. Send all orders to T. F. Cheek, Birmingham, Ala." Another face of the wrapper contained a further list of ailments for which the medicine was said to be efficacious, and the fourth face contained the advertisement of Simmons' blood purifying pills.

In May, 1878, T. F. Cheek entered into an arrangement with E. G. Eaton and F. H. Eaton, under which the firm of T. F. Cheek & Co. was organized, to manufacture the liver medicine at Memphis, Tenn., with the reservation in his favor that he was to be allowed to carry on his own manufacture at Birmingham. This concern used a wrapper, upon one face of which appeared the following: "Dr. A. Q. Simmons, the original and genuine Vegetable Liver Medicine." Just under this was the picture of Dr. A. Q. Simmons, on each side of which was printed the word "trademark," and under the picture a fac-simile of the signature of Dr. A. Q. Simmons, then a notation of the entry in the office of the Librarian of Congress, and then these words: "A cure for all diseases of the liver, biliousness, dyspepsia, sick headache, loss of appetite, costiveness, etc. T. F. Cheek & Co., proprietors and manufacturers, Memphis, Tenn." The other three faces contain certificates, one of which purported to be made by A. Q. Simmons, setting forth the fact that he had given T. F. Cheek the right to use his picture. This concern continued in business until some time in the year

1881 or 1882; and in June, 1882, T. F. Cheek and his wife, Mary J. Cheek, transferred to one Thomas A. White all their interest in T. F. Cheek & Co., and all their individual interest in the formula for making the liver medicine, together with the trademark, cuts, dies, wrappers, etc.; and the same month the Eatons likewise sold all their interest in the said property to White, who soon thereafter transferred all these rights and properties, such as they were, to J. H. Zeilin & Co., defendants hereto, and the business of T. F. Cheek & Co. wholly ceased —that is, said T. F. Cheek & Co. ceased doing business when the sale was made to White. Matters remained in this condition until January, 1890, or about that time. About the date last named, J. H. Zeilin & Co. opened a business at Memphis in the name of T. F. Cheek & Co., the defendant, I. L. Corse, being manager. This business consisted of a wareroom, wherein was stored boxes of liver medicine of the manufacture of defendants, Zeilin & Co., done up in packages as follows: Contained in wrappers very closely resembling those used by T. F. Cheek in his business at Birmingham, but with the following differences: Immediately under the picture of Dr. A. Q. Simmons is the name of Dr. A. Q. Simmons in printed letters, and on the lower part of that face of the package the sentence in the original Cheek package, beginning with the word " therefore," is changed so as to read as follows: " Therefore, information is given that Simmons' Liver Medicine will have on every package

an engraving of Dr. A. Q. Simmons and name of T. F. Cheek & Co." On the back of the package in controversy the following changes are made from the original Cheek package : The word "improved" is left out, so as to make the top of that side of the label read, "Simmons' Liver Medicine," and upon the lower part of that side of the package the words, " T. F. Cheek & Co., Memphis, Tenn.," are substituted for the corresponding words, " T. F. Cheek, Birmingham, Ala.," on the original Cheek wrapper. On the third side of the package in controversy, there are substituted in place of the advertisement of Simmons' blood purifying pills on the original Cheek wrapper, the following words : " Liver Medicine, by A. Q. Simmons. The original, as made by old Dr. A. Q. Simmons in his life-time. A cure for all diseases of the liver, biliousness, dyspepsia, sick headache, loss of appetite, costiveness, colic, heart-burn, fever and ague, etc." The fourth side is exactly like the original wrapper used by T. F. Cheek. There is but little resemblance to the wrapper used by T. F. Cheek & Co., the old firm, composed of Cheek and the Eatons, the only substantial similarity being the picture of Dr. A. Q. Simmons. With regard to this package, complainants charge that it was manufactured and put up in its present form to sell to the customers of complainant, and to the trade known by defendants to be the territory in which complainants' medicines were sold; that it is a spurious, fraudulent, and sham preparation of a liver medicine, purporting

upon the label and wrapper containing said medicine to be the genuine "Dr. Simmons' Liver Medicine," and further showing by the printed matter upon said label and wrapper that the same was warranted as purely vegetable by "A. W. Simmons & Co., heirs of Dr. A. Q. Simmons," and stating that the same was made and sold from and at the city of Memphis, Tenn., by the firm of T. F. Cheek & Co., when, in fact, it is not so made or sold by said T. F. Cheek & Co., but that it is manufactured and labeled and sold by and for the account of J. H. Zeilin & Co. and their agents, for the purpose of injuring the trade and damaging the business of complainant, and of deceiving the public; and that the pretended warranty by A. W. Simmons & Co. is fraudulent and fictitious, there being no such firm as A. W. Simmons & Co. or T. F. Cheek & Co. in the city of Memphis or elsewhere; that the object of this device and plan was to palm off said package as complainants' goods; that there is neither upon said label or wrapper of said package any thing to indicate to or inform the public that defendants are in any manner identified with the manufacture or sale of said package; and that the said defendants, Zeilin & Co., have studiously avoided any identification or apparent connection with the said preparation, both for the purpose of not interfering with their own medicine, known as "Dr. Simmons' Liver Regulator or Medicine," and in order that they might more effectually injure complainants' business; that from a date long

prior to 1868, and down to the present time, the liver medicine manufactured and sold by Zeilin & Co., and labeled as "Dr. Simmons' Liver Regulator or Medicine," has been known to the trade and consumers as "Liver Regulator" or "Simmons' Liver Regulator," the word "Medicine" being rarely used in connection with said preparation when speaking thereof or ordering the same; and that complainants' medicine, since 1840, has been generally known to the trade and consumers as "Simmons' Liver Medicine" or "Dr. Simmons' Liver Medicine" or "Simmons' Medicine," and that the words "Medicine" and "Regulator" have respectively been used and are used by the trade and by consumers to indicate which of the two preparations was and is wanted when called for, the word "Medicine" being used to identify complainants' liver medicine and the word "Regulator" being used to designate defendants' medicine; and that defendants, Zeilin & Co., well knowing these facts, had put upon the market said Cheek package in such a manner as would not injure the sale or detract from the price of their regulator, but that would come in direct competition with, and could be sold under calls or orders for complainants' "Simmons' Liver Medicine," and that said package had been put upon the market in that portion of the country where complainants' principal trade was at about one-half the price charged by Zeilin & Co. for their "Liver Regulator" and by complainant for its "Liver Medicine," and this reduction in price was made solely for the

purpose of damaging the trade and business of complainant, and to drive it out of the market; that all the packages of medicine manufactured by complainant and its predecessors in ownership contained, as one distinguishing feature of the wrapper thereof, an engraved portrait in black of Dr. M. A. Simmons, and that none of the packages of "Liver Regulator" manufactured and sold by defendants at any time contained on the wrapper thereof any picture of any person, but that they were characterized and designated by the name "Regulator" and by the large red "Z" on the front of each package thereof, but that on said Cheek package complained of there is a picture of Dr. A. Q. Simmons in black, placed upon the face of the label, of about the same size and of the same general appearance and in the same position relatively on the package or wrapper as the picture of Dr. M. A. Simmons on the packages made and sold by complainants, and that said picture was put upon said Cheek package by defendants, Zeilin & Co., to enable them the more easily to deceive the public and the consumers of complainants' medicine; that said Cheek packages are well calculated to deceive, and do deceive and entrap the unwary who call for "Simmons' Liver Medicine," manufactured and sold by complainants, the name, picture, and general appearance of the package deceiving them; and that defendants, well knowing this fact, have repeatedly filled orders with said Cheek packages, which orders called for "Simmons' Liver Medicine"

8—9 P

or "Dr. Simmons' Liver Medicine," made by complainants; and that said defendants are now selling large quantities of said medicine put up in said Cheek packages to complainants' customers and to the trade in the territory where complainant is most largely engaged in selling its said "Simmons' Liver Medicine," and that by reason thereof complainant has been greatly injured.

Respondents, Zeilin & Co., deny all charge of fraudulent purpose in putting out said Cheek package, and deny that it is a spurious or sham preparation; admit that said medicine is not, in point of fact, manufactured in the city of Memphis, and say that it is manufactured in the laboratory of respondents in the city of Philadelphia, and that J. H. Zeilin is sole proprietor of both J. H. Zeilin & Co. and of T. F. Cheek & Co.; deny that said medicine is sold in said packages at Memphis for the purpose of injuring and damaging the business of complainant and of deceiving the public; deny that the warranty of A. W. Simmons & Co. is pretended, fraudulent, or fictitious, and state that they have the right to use the firm name of A. W. Simmons & Co. or T. F. Cheek & Co. in the city of Memphis or elsewhere; set forth the facts of their purchase from T. F. Cheek and wife and the Eatons substantially as hereinbefore stated, and say: "Having acquired the trade-marks of T. F. Cheek & Co., respondents concluded to put up their medicine in the wrappers and labels used by T. F. Cheek & Co. at Birmingham, the only difference

being the substitution of Memphis, Tenn., for Birmingham, Ala., and sell their medicine through the Mississippi Valley, making Memphis the point from which the shipments were made. Accordingly, respondents, under the firm name of T. F. Cheek & Co., established a depot at Memphis, and have since conducted the business under the name of T. F. Cheek & Co. Respondents deny that the labels and wrappers in which said medicine is inclosed is any infringement whatever of the trade-mark rights of complainant. There is no resemblance whatever between the portrait of M. A. Simmons and A. Q. Simmons. The packages are not the same in color, and they bear no resemblance in color, and there is no probability of consumers being deceived in taking one for the other." That T. F. Cheek & Co. only sell said medicine in the form of powder and in twenty-five cent packages, and that respondents were induced to put up the medicine in this form because they could do so more cheaply than it could be put up in the form in which J. H. Zeilin & Co. sell their medicine, that is, their "Regulator;" and that the business of T. F. Cheek & Co. was intended to meet the demands of the trade in the Mississippi bottom, where the people are not accustomed to buying medicine in large packages; that the twenty-five cent package sold by T. F. Cheek & Co. was intended to meet the requirements of the negro trade in the Mississippi Valley; and that while the medicine is intrinsically as valuable as that of J. H. Zeilin & Co., it is put up

in a cheaper package, and is therefore sold for less money without interfering with the business of J. H. Zeilin & Co. at Philadelphia. They state that T. F. Cheek put said medicine up in a package in all respects similar to the one now in controversy as far back as 1871, and prior to the time when the predecessors of complainant adopted the square package and before they had abandoned the use of a tin can for their medicines; and there is no resemblance whatever between the labels and wrappers in use by complainant and his predecessors at the time T. F. Cheek began business, and the labels and wrappers then adopted by T. F. Cheek and now used by T. F. Cheek & Co.; deny that the use of said firm name of T. F. Cheek & Co. is a fraud upon the complainant or that it was intended to palm off spurious goods put up by respondents and sold by said firm, to the injury of complainant; deny that the medicine so put up is spurious, but say that it is pure and of the best quality; admit that there is nothing on the packages containing the medicine of T. F. Cheek & Co. indicating that respondents are in any manner connected therewith, and insist that they have a right to do business in Philadelphia under the firm name of J. H. Zeilin & Co. and in Memphis under the firm name of T. F. Cheek & Co.; deny that they have avoided any identification with T. F. Cheek & Co., but say that, on the contrary, they have openly shipped the medicine from their laboratory in Philadelphia to their store-house in the city of

Memphis, and that the defendant, Corse, who is a member of the family of J. H. Zeilin, has charge of the business; deny that the medicine is generally known by any particular appellation to all consumers, but say that it depends a great deal upon the locality as to what the public calls it— that among the more ignorant it is sometimes called "Simmons," without the use of any other word, and that generally it is called "Liver Regulator," and by some it is called "Liver Medicine;" that at various times since defendants began business various persons have used the words "Liver Medicine" in connection with the word "Simmons" in one form or another, and that for years they have been in litigation with first one and then another member of the family, and that a man by the name of Simmons, and not a member of the family, is selling a liver medicine in Texas, and uses the word "Simmons" as a part of his trade-mark, and that a man named Thedford is the manufacturer and vendor of "Simmons' Liver Medicine" at Judson, Ga., and that all this has been brought about by means of the extensive advertising of respondents' medicine, and that, consequently, to protect themselves, they having bought out T. F. Cheek & Co., as aforesaid, concluded to manufacture and put up in a cheaper package the medicine, and sell it in Memphis under the firm name of T. F. Cheek & Co., and under the trade-marks acquired, as aforesaid, from T. F. Cheek and Eaton. They deny that they have sold, and are now selling, large quantities of

the medicine of T. F. Cheek & Co. to the customers of complainant, or that they ever damaged complainant in any respect, but say they are selling the medicine to their own customers, and are doing what they can to build up a fair and legitimate business.

The complainant is not entitled to any relief on the ground of infringement of its trade-mark, as such, technically considered. The right to acquire property in a trade-mark, by the use upon vendible commodities of some mark, symbol, sign, or word susceptible of being used as such, is a common law right, and the property so acquired is always protected by Courts of Equity in a proper case. The object and purpose of a trade-mark is to indicate by its meaning or association the origin or ownership of the article to which it is applied, so that the manufacture or product of the owner of same may be readily recognized in the market. "This may, in many cases, be done by a name, a mark, or device well known but not previously applied to the same article. But though it is not necessary that the word adopted as a trade name should be a new creation never before known or used, there are some limits to the right of selection. * * * No one can claim protection for the exclusive use of a trade-mark or trade name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured rather than protected, for competition would be de-

stroyed. Nor can a general name, or name merely descriptive of an article of trade—of its qualities, ingredients, or characteristics—be employed as a trade-mark, and the exclusive use of it be entitled to legal protection." *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.*, 138 U. S., 537; *Delaware & H. Canal Co.* v. *Clark*, 13 Wall., 311.

The words "Liver Medicine" are purely descriptive, and could not be appropriated by the complainant to indicate its preparation alone, nor could the word "Simmons," in connection with the words "Liver Medicine," be appropriated by the complainants to its preparation alone, that name, under the proof, having become merely descriptive of medicine prepared under the formula of old Dr. Simmons, and used by many people in connection with medicines prepared under that formula. *Marshall* v. *Pinkham*, 52 Wis., 572.

But the complainants contend that at all events they are entitled to relief against this Cheek package, on the ground of what is styled, in some authorities, unfair competition in business. In relation to the class of subjects we now have under consideration, this may be defined, in general terms, as consisting of any device or trick whereby one manufacturer's or dealer's goods are palmed off in the market as and for the goods of another, in fraud of the public and of the person whose goods are so displaced, the most usual of such devices being the simulation of labels, the imitation of another's style of putting up goods, and the repro-

duction of the form, color, and general appearance
of his packages. An attempt to enumerate all such
devices would be as futile as an effort to catalogue
all the expedients that fraud can employ. It is
only within recent years that a distinction has been
taken in the authorities between this class of con-
troversies and technical trade-mark cases. In the
earlier reported decisions, infringements of trade-
marks and simulations of labels and packages are
all intermingled under the general designation of
trade-marks, or treated as in substance the same
thing, if not the same in exact definition. Lat-
terly, however, especially in this country, the tend-
ency has been to a narrowing of the use of the
term "trade-mark" to its proper signification as an
arbitrary symbol affixed by a manufacturer or mer-
chant to a vendible commodity, and to exclude
from use as such symbol words merely descriptive
or generic, or merely expressive of quality; and
also to exclude from designation as such labels, ad-
vertisements, signs, and the form, size, and general
appearance of packages of merchandise. Browne
on Trade-marks, Secs. 29, 39, 43, 79, 81, 83, 87, 89,
89*a*, *b*, *c*, *d*, 90, 91; 130, 131–134, 137, 544.

The new classification, while useful, seems to
lack something of logical accuracy, inasmuch as
the imitation of another's trade-mark, if inten-
tional, and done with the purpose of pirating his
trade thereby, is as truly an instance of unfair
competition in business as any other fraudulent de-
vice adopted for that purpose. So that the effect

C. F. Simmons Medicine Co. *v.* Mansfield Drug Co.

is, in the main, only the attainment of a more correct and accurate use of the term " trade-mark," while the cases falling under the new classification are subject to most of the principles that govern technical trade-marks, but not to all.    Moreover, the principles that are common to trade-mark law as thus narrowed, and to the subject of unfair competition in business, are also applicable to competition in other kinds of business besides the sale of articles of merchandise, leaving, however, a residuum of peculiar rules applicable only to technical trade-marks.

The correspondences between the two classes of cases are more numerous than their differences.  As in cases of trade-mark, so in cases of unfair competition in business, imposition upon the public is a necessary constituent of the plaintiff's title to sue, but only in the fact that it is the test of the invasion of the plaintiff's rights by the defendant. As in one, so in the other, the object and purpose of the law is, first, to secure to him who has been instrumental in bringing into market a superior article of merchandise the fruit of his industry and skill, and, secondly, to protect the community from imposition.    As in one, so in the other, the underlying principle is that one man is not to sell his own goods under pretense that they are the goods of another; and as in one, so in the other, the violator of another's rights pirates upon the good will of that other's friends and customers or the patrons of his trade and business, by sailing

under his flag without his authority or consent. There is this difference, however. The law of trade-marks is designed to protect primarily a property right (Browne on Trade-marks, Secs. 45-47), and, as incidental thereto, gives redress for the injuries resulting from invasions of that right, a distinct, technical trade-mark being in itself evidence, when wrongfully used, of an illegal act, while the jurisdiction exercised over cases of unfair competition in business is grounded in the prevention of fraud. Fraudulent intention is not a necessary ingredient of a pure trade-mark case, as an invasion of another's trade-mark rights may be the result of accident or of a misunderstanding, although it may be and probably is true that in the majority of cases fraud is an element in trade-mark cases in awarding damages and costs (Browne on Trade-marks, Secs. 386, 468), while in a case of unfair competition in business, fraud is of its essence. Browne on Trade-marks, 2d Ed., pages 417-423, Secs. 418-420; *Apollinaris Co.* v. *Brumler*, decided by the Supreme Court of New York, reported in New York Law Journal, February 4, 1890; Cox's Manual of Trade-mark Cases, 2d Ed., 429, 430; *Carson* v. *Ury*, 39 Fed. Rep., 777. In the last-named case the true distinction is thus accurately expressed by Thayer, J.: "The Court cannot interfere in this instance, as in ordinary trade-mark cases, on the ground that one person is intentionally or unintentionally appropriating a mark, symbol, design, or word which has become the exclu-

sive property of another when used by him to distinguish goods of a certain class. In short, this is not a trade-mark case. As I view it, it is a bill filed to restrain the defendants from perpetrating a fraud which injures the complainant's business and occasions him a pecuniary loss. Even where no trade-mark was infringed or involved, Courts of Equity have granted injunctions on more than one occasion against the use upon goods of certain marks, labels, wrappers, etc., when the evident design of such use was to deceive the public by concealing the true origin of the goods and making it appear that they were the product of some other manufacturer of established reputation, thereby depriving the latter of a portion of the patronage that would otherwise come to him, or injuring the reputation of his goods."

A short reference to some of these cases may be useful. In *Knott* v. *Morgan*, 2 Keen, 213 (Cox's Manual, No. 57), it appeared that the omnibuses of the London Conveyance Company were painted, and their servants clothed, in a special and distinctive manner, and that defendant began to run omnibuses similarly painted, with servants similarly clothed. On motion by plaintiff, an injunction was granted to restrain the defendants from imitating the plaintiff's line of omnibuses. Lord Langdale, in delivering his judgment in the case, expressly stated that the plaintiff had no exclusive right to the words "Conveyance Company" or "London Conveyance Company," or any other words, but held

that they had the right to call upon the Court to restrain the defendants from fraudulently using precisely the same words and devices which plaintiff had taken for distinguishing his property, and thereby depriving him of the fair profits of his business by attracting custom on the false representation that carriages, really the defendant's, belonged to or were under the management of the plaintiff.

In *Williams* v. *Johnson*, 2 Bos., 1, decided by the Supreme Court of New York in 1857, and reported as No. 150 of Cox's Manual, it appeared that plaintiffs were manufacturers of soap which they sold under the name of "Genuine Yankee Soap," using a particular style of wrapper, form of cake, hand-bill, etc., and that the defendant put up his soap in a similar manner with slight variations. It also appeared that there was sufficient doubt about the exclusive right of the plaintiff to use the words "Genuine Yankee" to prevent their being protected. An injunction was granted restraining the defendant from using the simulated wrapper, etc., complained of. Woodruff, J., in his judgment referred particularly to the form and size of cake, particular mode of covering and packing, a combination of three labels on each cake, and an exterior hand-bill upon the box, and the arrangement of the whole, and to the fact that the defendant had copied the form, appearance, color, style, and substantial characteristics which distinguished the plaintiff's goods.

In *Lea* v. *Hailey*, an English case, decided in 1869, and reported as No. 325 in Cox's Manual, it appeared that the plaintiffs were coal merchants, and carried on business at 22 Pall Mall as "The Guinea Coal Company," and that the defendant, who was their former manager, set up for himself at Beaufort Buildings, Strand, as the "Pall Mall Guinea Coal Company," and afterwards removed to 46 Pall Mall. An injunction was granted to restrain the defendant from trading under that name in Pall Mall. It was said, per Giffard, L. J.: "I quite agree that the plaintiffs have no property in the name (Guinea Coal Company), but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade and carries it on under a given name that some other person should assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in in the belief that they are dealing with a person who has given a reputation to the name."

In *Frese* v. *Bachof*, decided by Judge Wheeler, of the United States Circuit Court for the Southern District of New York, in 1878 (R. Cox's Man., 603), it appeared that plaintiffs were a firm of tea merchants who sold "Hamburg Tea" in a peculiar form of package, the tea being inclosed in long, cylindrical parcels with pink wrappers, and with crimson papers of directions and yellow ones of warning tied in, and having a white label with

the firm name within a circle pasted across the ends of the string, and another white label with the same, and the words "Hamburg Hopfensack 6" embossed thereon, pasted on the package. The defendant at first put up his tea in a precisely similar manner, but, after the commencement of the suit, discontinued the firm name and inserted his own. An injunction was granted restraining him from using packages similar to those of the plaintiff.

In *Sawyer* v. *Horn*, decided in 1880, in the United States Circuit Court for the District of Maryland (R. Cox's Man., 667), complainant alleged that to individualize and identify his bluing, he adopted a peculiar and original style of package, "consisting of a blue cylinder having a red top," and that his goods had long been known and identified by consumers by the peculiar appearance of the package. It was also set forth that his method of packing, including the size, shape, and color of his large packages, was original with him, and had never been varied. It was shown that the defendant had knowingly made and sold bluing put up in boxes and packages imitating complainant's article in all these particulars, except that he used his own name and made changes in the wording of his label. Defendant was restrained from putting up his goods in the manner stated, "or in any other manner so simulating the form, color, labels, and appearance given by the complainant to his goods, as to mislead purchasers into taking one for

the other," and this "whether the plaintiff has a trade-mark or not."

In *Avery* v. *Meikle*, 81 Ky., 75, decided in 1883, it appeared that the defendant had not imitated plaintiff's trade-mark, yet, that by the exact simulation of plaintiff's plow in every perceivable point, exposed to an ordinary observer and purchaser, and the use of the same coloring and staining, the same relative position of the letters and figures as employed and used by the plaintiff, avoiding the literal appropriation of any part of the trade-mark, they had obscured their own and appellant's trademark, but at the same time sought to avoid detection and responsibility in doing so, and to cause their plows to be taken for and purchased as those of plaintiff; that, laying aside their own letters and numerals, which they commonly used to indicate the size, series, and quality of their plows, they took up those of plaintiff; that they quit lettering cast and figuring steel plows, and reversed that order, adopting the order used by plaintiff; that they consulted and deliberated before adopting the letters and numerals or imitating the construction of plaintiff's plows; and that after this deliberation they so imitated the numerals and lettering of appellant's plows that nothing but the reading of their trade-mark, and close inspection, could distinguish the difference; that they made large quantities of plows, leaving off their own trade-mark and name and substituting therefor the names of jobbers who were well known in the market to be

vendors and not makers of plows, making it in their hands, therefore, impossible, without the aid of expert knowledge, to tell the difference between a Meikle and an Avery plow, as they both had the same *indicia* and were constructed alike, the maker's name being altogether suppressed; and that they employed small salesmen to sell their plows, who placed them on the market one-half dollar cheaper 'than the Avery plow, and so advertised them as to be taken for those of plaintiff. It was held that plaintiffs were entitled to injunction and relief. And in setting forth the grounds of the judgment the Court say: "The confusion which prevails in the argument against the jurisdiction in this case results from assuming that in all cases the complainant must make out a legal title to an exclusive trade-mark, by means of which, or some part of which, the defendant had done the wrong and injury to his rights. The authorities do not sustain this assumption, but, on the contrary, are numerous and strong that the wrong consists in one person fraudulently selling his goods as and for those of another, either by the use of the other's trade mark or *indicia*, or by any means whatever, if such fraudulent practices result, or are likely to result, in damage to the complainant. * * * As the object of the Courts of Equity is to prevent one man injuring another's rights by selling his goods as those of the other, why not prevent all fraudulent misrepresentations—whether oral, by signs, symbols, trade-marks, labels, words,

or figures—by which that wrong is accomplished? The injury is the same, no matter how or by what means it may be done, and the responsibility should attach when that. injury is deliberately and fraudulently. committed."

In *Lelanche Battery Co.* v. *Western Electric Co.*, 23 Fed. Rep., 275, decided in 1885, it appeared that there was no trade-mark in the case, but say the Court: "The defendants have imitated the label of the complainant to the minutest details, except the signature at the bottom. The complainant is entitled to protection against the unlawful competition in trade thus engendered by the simulation of its label, and upon this ground a decree is ordered in its favor."

In the case of *Anheiser Busch Brewing Association* v. *Clarke*, 26 Fed. Rep., 410, decided in 1886, it appeared that "the complainant was the first to use for bottled beer a label with a diagonal red band, with the name of the kind of beer appearing in white letters on the red band, and that he has been habitually using this label for two years." It appeared to the Court, from an inspection of the labels, that defendant's labels on bottles of beer would be likely to deceive purchasers desiring complainant's beer, and an injunction was ordered. There was no question of trade-mark in the case. To same effect see *Anheiser Brewing Co.* v. *Pisa*, 24 Fed. Rep., 149.

And Browne, in his work on Trade-marks, at Section 43, under the heading of "Unfair Compe-

9—9 P

tition in Business," writes thus: "In examining cases classified in digests and books of reports as those of trade-marks, the reader is sometimes puzzled. In the absence of the slightest evidence that technical trade-marks have been infringed, Courts of Equity have granted full and complete redress for an improper use of labels, wrappers, bill-heads, signs, or other things that are essentially *publici juris*. The difficulty is that wrong names are used. French speaking nations have a standard name for this kind of wrong. The term used is *concurrence deloyale*. This term may be fairly anglicized as a dishonest, treacherous, perfidious rivalry in trade. In the German Imperial Court of Colmar, in 1873, the Court said that current jurisprudence understands by *concurrence deloyale* all maneuvers that cause prejudice to the name of a property, to the renown of a merchandise, or in lessening the custom due to rivals in business. The euphemism employed as a head to this section will answer the present purpose. It implies a fraudulent intention, while, on the contrary, an enjoinable infringement of a technical trade-mark may be the result of accident or misunderstanding, without actual fraud being an element. At law special damage, unless damage is necessarily presumed, deceit, or fraudulent intent must be proved in all cases to warrant a recovery. This is not always so in equity, but it is common both in law and equity where the infringement is perpetrated by other modes and means than the use of any part of a

trade-mark itself; and, whether a trade-mark is shown to have been imitated or not, if the goods of one have been intentionally and fraudulently sold as the goods of another, and the latter has sustained damage, or the former threatens to continue acts tending to that end, a Court of Equity will restrain the further commission of them. This subject belongs properly to the class of good will cases, but, nevertheless, it is necessarily an ingredient in a great majority of trade-mark cases. As an illustration, take *Craft* v. *Day*, in 1843, which is not a technical trade-mark case. In that, Lord Langdale, M. R., granted an injunction to restrain the defendant from using labels or show-cards calculated to mislead the public, saying that the right which any person may have to the protection of the Court does not depend upon any exclusive right to a particular name of a man or to a particular form of words. His right, said he, is to be protected against fraud, and fraud may be practiced by means of a name, though the person using it have a perfect right to use that name provided he do not accompany the use of it with other circumstances to effect fraud."

In *Croft* v. *Day*, 7 Beav., 84, above referred to, the following apt language upon this subject also occurs, in addition to that above quoted: "The accusation which has been made against this defendant is this: That he is selling goods under forms and symbols of such a nature and character as will induce the public to believe that he is sell-

ing the goods which are manufactured at the manufactory which belonged to the testator in this cause. It has been very correctly said that the principle in these cases is this: that no man has the right to sell his own goods as the goods of another. You may express the same principle in a different form, and say that no man has a right to dress himself in colors, or adopt the bare symbols, to which he has no peculiar or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose either that he is that other person or that he is connected with and selling the manufacture of such other person, while he is really selling his own. It is perfectly manifest that to do those things is to commit a fraud, and a very gross fraud."

And in *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.*, 138 U. S., 537, it is said: "It seems, however, to be contended that plaintiff was entitled at least to an injunction, upon the principle applicable to cases analogous to trade-marks—that is to say, on the ground of fraud on the public and on the plaintiff, perpetrated by defendant by intentionally and fraudulently selling its goods as those of the plaintiff. Undoubtedly, an unfair and fraudulent competition against the business of the plaintiff—conduct with the intent on the part of the defendant to avail itself of the reputation of the plaintiff to palm off its goods as plaintiff's—would in a proper case constitute ground for relief." Then the Court further proceeds: "In *Putnam Nail Co.* v. *Bennett*, 43

C. F. Simmons Medicine Co. v. Mansfield Drug Co.

Fed. Rep., 800, where the bill alleged that the defendants had imitated plaintiff's method of bronzing horse-shoe nails which plaintiff used as a trademark, with the intention of deceiving the public into buying their goods instead of plaintiff's, and the question came up on demurrer, Mr. Justice Bradley, after stating certain averments of the bill, said orally: ' There is here a substantial fact stated, that the public and customers have been, by the alleged conduct of the defendants, deceived and misled into buying the defendant's nails for the complainant's. That averment is amplified in paragraph four of the bill. Now, a trade-mark, clearly such, is in itself evidence, when wrongfully used by a third party, of an illegal act. It is of itself evidence that the party intended to defraud and to palm off his goods as another's. Whether this is in itself a good trade-mark or not, it is a style of goods adopted by the complainant which the defendants have imitated for the purpose of deceiving, and have deceived, the public thereby, and induced them to buy their goods as the goods of the complainant. This is fraud.' " The Court quotes with approval the case of ' Wotherspoon v. Currie, L. R., 5 H. L., 508, known as the " Glenfield Starch Case," and Thompson v. Montgomery, L. R., 41 Ch. Div., 35 and 50, known as the " Stone Ale Case."

" In this important case," says the learned compiler of Cox's Manual of Trade-mark Cases in a note to same, " the Supreme Court of the United States for the first time in its history recognizes

and explains the fundamental differences between
the piracy of a trade-mark and unfair competition
in business. In *Goodyear Co.* v. *Goodyear Rubber
Co.*, allusion was made to the existence of a rule
whereby 'unfair trade' is restrained, but no attempt
was made to define it, or to interpret the adjudi-
cations which illustrate its application and purpose.
The lucid and accurate opinion of Chief Justice
Fuller in the case before us establishes a classifica-
tion which is obviously logical and obviously useful
and of value to the public; and his conclusions
are at variance with perhaps not a single well-con-
sidered case to be found in the books. The doc-
trines affecting the protection of technical trade-
marks are easily understood; but the subject of
what has come to be known as 'unfair competition
in business' is much broader and more important.
We have here a recognition of the two kinds of
cases—(1) those dependent upon the right of prop-
erty, and (2) those dependent upon fraud, whereby
the earlier cases and the thought and learning of
the past are harmonized and made to run hand in
hand." And, as the learned author further remarks,
"Courts of Equity will direct the manner in which
words that are *publici juris* shall be used, and will
prohibit their use in an inequitable manner for the
purpose of misleading the public and displacing an
existing business. Beyond this none of the cases
go, nor can they be made to go without endan-
gering the doctrine which supports them. Thus, in
*Wotherspoon* v. *Currie* the wrong-doing consisted not

in the use of the word 'Glenfield' in the abstract, but in the use of that word in a particular way. It was printed by the defendant in conspicuous type, whereby his starch was offered and sold as 'Glenfield Starch.' He did not use the word 'Glenfield' to indicate where his article was made, but, in the words of the Court of Appeals of New York, as 'a short phrase between buyer and seller,' or, in the words of the Supreme Court of the United States, the phrase which indicated 'the wish to buy, and the power to sell from that origin.' He used it in that 'secondary sense' which had come to mean the starch of the complainant. * * It has happened in many instances in which descriptive words have been involved that, by reason of the character of the pleadings or because there was no attempt to apply the doctrine of unfair competition, the plaintiff has failed. But the effect of these cases is to establish only that descriptive words are *publici juris.* They do not decide that the manner in which such words are used will not be regulated according to the maxims of equity. There are decisions perhaps which justify deliberate fraud, but they are based, in almost every instance, upon an illogical view of the common law rights of the defendant, and the assumption that the plaintiff was assailing those rights. But there is no real conflict between the authorities; there has been merely an evolution of thought, whereby we reason with better results and are enabled to understand the old doctrine and more intelligently

to apply it. Perhaps the larger expression is due to looking at the old doctrine under a stronger light and with the aid of the influences of an increasing civilization." These comments of the learned author meet with our approval.

The Supreme Court of the United States, in a very recent case (*Brown Chemical Co.* v. *Meyer*, 139 U. S., 540), make the following additional observations upon this subject: "The theory of a trademark proper, then, being untenable, this case resolves itself into the question whether the defendants have, by means of simulating the name of plaintiff's preparations, putting up their own medicine in bottles or packages bearing a close resemblance to those of plaintiff, or by the use of misleading labels or colors endeavoring to palm off their goods as those of the plaintiff. The law upon this subject is considered in the recent case of *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.*, 138 U. S., 537. The law does not visit with its reprobation a fair competition in trade. Its tendency is rather to discourage monopolies except where protected by statute, and to build up new enterprises from which the public is likely to derive a benefit. If one person can, by superior energy, by more extensive advertising, by selling a better or more attractive article, outbid another in popular favor, he has a perfect right to do so, nor is this right impaired by an open declaration of his intention to compete with the other in the market."

As to the quantum and character of evidence in

this kind of case, some useful observations occur in the reports. In *Croft* v. *Day, supra,* it is said: "It is perfectly manifest that two things are required for the accomplishment of a fraud such as is here contemplated. First, there must be such a general resemblance of the forms, words, symbols, and accompaniments as to mislead the public; and, secondly, a sufficient distinctive individuality must be preserved so as to procure for the person himself the benefit of that deception which the general resemblance is calculated to produce. To have a copy of the thing would not do, for though it might mislead the public in one respect, it would lead them back to the place where they were to get the genuine article, an imitation of which is improperly sought to be sold. For the accomplishment of such a fraud it is necessary, in the first instance, to mislead the public, and, in the next place, to secure a benefit to the party practicing the deception by preserving his own individuality."

In *McCann* v. *Anthony* the Supreme Court of Missouri say: "The governing principle is that one manufacturer shall not be allowed to impose his goods upon the public as the goods of another manufacturer, and so derive a profit from the reputation of that other. It is not necessary that the trade mark, trade name, sign, label, or other device which is employed by one merchant for that purpose shall be an exact imitation or counterfeit of the trade-mark, trade-name, sign, label, or other device employed by the other manufacturer. Nor

is it required · that the imitation be so close as to deceive cautious and prudent persons. It is sufficient if it be so close as to deceive the incautious and unwary, and thereby work substantial injury to the other manufacturer. Nor is it necessary to prove that actual fraud was intended by the manufacturer employing the simulated trade-mark, trade-name, sign, label, or other device, in order to entitle the other manufacturer to relief in equity, or to an action for damages at law. Here, as in most other civil actions, the law does not attempt to penetrate the secret motives or intent with which the act is done, but contents itself with the conclusion that the party intended the natural and probable consequence of the act, and gives its judgment accordingly." Price & Stewart's American Trade-mark Cases, p. 1061.

In *Hostetter* v. *Adams*, 10 Fed. Rep., 838, the criterion is stated to be: "If the general effect is to deceive an ordinary observer having no cause to use more than ordinary caution." In speaking of the packages in controversy in that case, Judge Blatchford says: "But the general effect to the eye of an ordinary person acquainted with plaintiff's bottle and label, and never having seen the defendant's label, and not expecting to see it, must be, on seeing the defendant's, to be misled into thinking it is what he has known as the plaintiff's."

And, by analogy to trade-mark cases, "it would be a mistake, however, to suppose that the resemblance must be such as would deceive persons who

should see the two marks placed side by side. The rule, so restricted, would be of no practical use. If a purchaser, looking at the article offered to him, would naturally be led, from the mark impressed on it, to suppose it to be the production of the rival manufacturer, and would purchase it in that belief, the Court considers the use of such a mark to be fraudulent. But I go further. I do not consider the actual physical resemblance of the two marks to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market, may be as much a violation of the rights of that rival as the actual copy of the device." *Seixo* v. *Provezende,* No. 256 Cox's Manual Trade-mark Cases.

And, continuing the analogy of trade-mark cases, " all that can be done is to ascertain in every case as it occurs, whether there is such a resemblance as to deceive a purchaser using ordinary caution. To constitute an infringement of a trade-mark, exact similitude is not required, but an infringement is committed when ordinary purchasers, buying with ordinary caution, are likely to be misled, it being enough to show that the representations bear such a resemblance to the plaintiff's mark as to be calculated to mislead the public generally who are purchasers of the article bearing it. That means

persons of ordinary intelligence who adopt ordinary precaution against imposition and fraud, and use such reasonable care and observation as the public generally are capable of using and may be expected to exercise. It is sometimes the case that the names of articles are of a character to mislead and deceive, they being *idem sonans* in the usual pronunciation; or the form of the package, general appearance of the wrapper, color of label, wax impressions on the top of the box containing the goods, are well suited to divert the attention of the unsuspecting buyer from any critical examination, and the Courts do not require a critical examination. It was well said by Wood, V. C., in 1854, that in every case the Court must ascertain whether the differences are made *bona fide*, in order to distinguish the one article from the other, whether the resemblances and the differences are such as naturally arise from the necessity of the case, or whether, on the other hand, the differences are merely colorable, and the resemblances are such as are obviously intended to deceive the purchaser of the one article into the belief of its being the manufacture of another person. Resemblance is a circumstance of primary importance for the Court to consider, because if the Court finds, as it almost invariably does find in such cases, that there is no reason for the resemblance except for the purpose of misleading, it will infer that the resemblance is adopted for the purpose of misleading. Such is the reasoning of all the Courts.

Probably Vice-chancellor Shadwell did not go too far, in 1847, when he said that 'if a thing contains twenty-five parts, and but one is taken, an imitation of that one will be sufficient to contribute to a deception, and the law will hold those responsible who have contributed to the fraud.'" Browne on Trade-marks, Sec. 33, and cases cited.

And in the case of *Read* v. *Richardson*, appearing as No. 698 of Cox's Manual of Trade-mark Cases, the following facts appeared: The plaintiffs and defendants were bottlers of beer for export. Plaintiff's label consisted of a representation of the head of a bull-dog on a black ground, surrounded by a blue circular band, on which were the words, "Read Bros., London: the Bull-dog Bottling." Defendants' label consisted of the representation of the head of a terrier on a black ground, surrounded by a red circular band, on which were the words, "Celebrated Terrier Bottling, E. Richardson," one considerably larger than the other, as appears from the cuts attached to the report of the case. It was made to appear that plaintiff's beer was well known in the colonies as "Dog's Head Beer," and it was alleged that defendants, by exporting their beer to the colonies, where plaintiff's beer was in demand, enabled the substitution of defendants' beer for plaintiffs' beer as "Dog's Head Beer," to plaintiffs' injury. A motion for a preliminary injunction was heard by Jessel, Master of the Rolls, who denied the motion, chiefly on the ground that plaintiffs had failed to

make out a case of infringement. On appeal, it was held that the use of the defendants' label was an infringement of plaintiffs' rights, especially because it enabled the sale of defendants' beer as "Dog's Head Beer," which name had come to be known as indicating the beer of the plaintiffs. And see *Montgomery* v. *Thompson*, No. 722, Cox's Manual of Trade-mark Cases.

Concerning the Cheek package under consideration, we find the facts to be that there is now in existence no such firm as T. F. Cheek & Co., the old name of T. F. Cheek & Co. being used by the defendants, Zeilin & Co. and Zeilin & Co., incorporated, in floating said package on the market, the goods being really put up in Philadelphia by Zeilin & Co. as a part of the operations of that business, and sent to Memphis and stored in a wareroom there under charge of one of Zeilin & Co.'s agents, to be thence distributed to the trade. We also find that there is not, and never was, any such firm as A. W. Simmons & Co. represented upon said package, and that A. W. Simmons never authorized defendants to use his name, and that name, together with the representation "warranted purely vegetable by A. W. Simmons & Co., heirs of Dr. A. Q. Simmons," is a misrepresentation, and calculated to deceive the public. We also find the representation on the face of said package as to the improvement of the medicine is also a misrepresentation. And as to whether defendants ever acquired any substantial rights by

the transfer from T. F. Cheek, the proof does not satisfy our minds. We are far from being satisfied by the proof that T. F. Cheek ever acquired any rights from A. Q. Simmons such as he undertook to transfer to White. And certainly the transfer by him and the Eatons of a bare name, unconnected with any existing business, and when that business was bought only to be extinguished, as we think the proof shows, could not confer the right to revive the old name and insignia of that business eight years afterward, to the prejudice of a rival in trade, and for the purpose of foisting upon the public packages of goods that might, by the use of said old insignia, be substituted for the goods of such rival, and lend to the device the semblance of a prior right.

We also find that the trade of the complainant is confined principally to the South-west, and that in that territory its preparation is generally known and called for under the name of "Simmons' Liver Medicine," and that those are the prominent words on the face of its packages, the word "Simmons" being preceded by the letters "M. A.," and the word "Vegetable" being printed in small letters between the word "Simmons" and the word "Liver," so that at the distance of a few feet the title appears to be, "Dr. M. A. Simmons' Liver Medicine;" also, on the front of said package is the picture in black of Dr. M. A. Simmons on a white ground slightly shaded. On the front of the Cheek package is also a picture in black, and under it the

name of Dr. A. Q. Simmons printed, and just under that, in letters near the same size, the words "Simmons' Liver Medicine." On the back of the Cheek package, near the top, are the words again "Simmons' Liver Medicine," and near the bottom, on the same side, the words "warranted purely vegetable." On the back of complainant's package, in the same position, are the words, "Dr. M. A. Simmons' Vegetable Liver Medicine." In color the packages are not very similar, the color of the Cheek package being pale straw with the printing all in black ink, and complainant's package being white with the printing in black ink, with a bronze border and a bronze shading over the word "vegetable," and the words " C. F. Simmons & Co." being printed in bronze ink, and on the back the word "vegetable," and the words "dyspepsia," "indigestion," and "original" being printed in bronze ink. As to size, it comes nearest complainant's dollar package, the Cheek package being about one-half inch shorter, and being a twenty-five cent package. Placed side by side and compared, the differences between these packages are soon discovered; but, as ruled in the authorities which we have cited, that is not the true criterion. If the general effect is such as to deceive an ordinary observer, having no cause to use more than ordinary caution, being acquainted with plaintiff's package and label, and never having seen the defendants' package and label, and not expecting to see it, must be, on seeing the defendants', to be misled

into thinking it is what he has known as the plaintiff's, that is sufficient. We think, when we take into consideration the large black picture on each package, the most prominent feature on each, together with the words "Simmons' Liver Medicine," which has come to be associated in the minds of the people with complainant's preparation, and the arrangement and collocation of words before referred to, that an ordinary person calling for complainant's preparation and exercising only ordinary caution, and having the Cheek package handed to him, would mistake one for the other. And the proof shows that since this package has been upon the market it has in numerous instances been received by customers calling for complainant's medicine, without question or objection. The proof also shows that this package was put upon the market only in this section of the country, where complainant's trade existed. We also think that this package was put upon the market by the defendant for the purpose of having it take the place of complainant's medicine, and to be sold as and for that medicine. We think the charge of unfair competition in business has been clearly made out against the defendants with regard to this Cheek package.

The complainant is entitled to an injunction restraining J. H. Zeilin & Co. and J. H. Zeilin & Co., incorporated, from putting on the market their medicine put up in packages with the Cheek labels on them, and from disposing of the packages so

10—9 P

labeled that are now in existence, and from issuing packages of their medicine with the imprint upon their label or packages of the words "Simmons' Liver Medicine" or "Dr. Simmons' Liver Medicine" or "Liver Medicine by A. Q. Simmons," in conjunction with the picture of A. Q. Simmons, or in such other combinations as will cause them to be mistaken for complainant's packages by one exercising ordinary care; and that complainant is entitled to an injunction to restrain the defendants from using the Cheek package or label or wrapper in any manner or form; and the complainant is entitled to have the cuts, dies, labels, and wrappers pertaining to said Cheek package delivered up to be destroyed.

Defendants insist that the Chancellor erred in ordering an account to ascertain the damages of complainant in respect of the Check medicine made and sold by defendants. It is customary in this class of cases to order such an account. *Gato* v. *Elmodelo Cigar Mfg. Co.*, 6 Lawyers' Reports Annotated, 824; *Atlantic Milling Co.* v. *Robinson*, 20 Fed. Rep., 217; *Atlantic Milling Co.* v. *Rowland et al.*, 27 Fed. Rep., 24. But it is said that the complainants have been guilty of such laches as would deny them the right to an account. This is a good defense to an accounting where there has been real neglect. Browne on Trade-marks, Sec. 497; *McLean* v. *Fleming*, 96 U. S., 245; *Holt* v. *Menendez*, Price & Steuart's American Trade-mark Cases, 986 and 989. But we do not think there

has been any such delay in this case as to deny complainant the right to an accounting. The Cheek package was put on the market in January, 1890, and the bill in this case was filed in January, 1891. A party is not compelled to file his bill at once, but may lie by until sufficient time shall elapse to enable him to gather the requisite proof; besides, it appears from a letter in the record, written by Mr. I. L. Corse, defendants' agent, in January, 1890, that defendants had full information that their putting the Cheek package on the market had been promptly complained of by the complainant, and was bitterly objected to by complainant. Defendants also insist that complainant should be denied the account, because T. F. Cheek at Birmingham and T. F. Cheek & Co. at Memphis were making and selling the medicine from 1871 to 1882, and complainant's predecessor did not object. Without going into the question as to whether the conduct of T. F. Cheek and of the old firm of T. F. Cheek & Co. ten to twenty years ago amounted to a violation of the rights of complainant's predecessor, it is sufficient to say that, even if it were, it could not justify the defendants' conduct at this time.

We do not consider the questions raised by defendants' cross-bill. We think the defendants' conduct with regard to the Cheek package is such as to disentitle them to any relief in a Court of Equity. The cross-bill will therefore be dismissed.

A decree will be entered in accordance with this.

opinion, and the cause remanded for the execution of the order of reference, and for the delivery and cancellation of said cuts, dies, labels, and wrappers. The costs below will be paid as adjudged by the Chancellor. The costs of this Court will be paid by defendants, and subsequently accruing costs as the Chancellor may direct.