GORHAM MFG. CO. v. EMERY-BIRD-THAYER DRY-GOODS CO. et. al.

(Circuit Court, W. D. Missouri, W. D. February 13, 1899.)

No. 2,078.

1. UNFAIR COMPETITION—EVIDENCE PROCURED BY DECEIT.

An agent of complainant, which was a manufacturer, purchased an article from a saleswoman in defendant's store, being distinctly told that it was not of complainant's manufacture; but after the purchase, by a false statement to the clerk, he induced her, for the purpose of obliging him, to mark the duplicate sale bill delivered to him with the purchase to indicate that the article was of complainant's make. *Held*, that complainant could not avail itself of such fact as evidence in support of a claim that defendant sold other goods as those of complainant.

2. SAME—FRAUDULENT INTENT—NOTICE TO DEFENDANT.

A fraudulent intent is of the essence of unfair competition in trade; and, where a manufacturer believes a dealer to be selling the goods of another as his, he should give the dealer notice, and an opportunity to desist, before bringing suit.

3. SAME—SELLING GOODS AS THOSE OF ANOTHER MAKER.

Complainant, in its bill, charged defendant with unfair competition, in selling goods of other makers as those of complainant. The sole evidence of any such sales was the testimony of agents of complainant, sent for the purpose of procuring evidence, which was not very satisfactory, and failed to show a single sale to a bona fide purchaser, or any motive therefor, or that defendant knew of the sales so made; but, on the contrary, showed that it did not know of them, and that the representations made by its clerks were contrary to its orders and rules. It was further shown that no notice of any claim of such conduct was given to defendant until suit was brought; and the evidence tended to show that the real purpose of the suit was to prevent the defendant from selling complainant's goods, because it sold them at a lower price than competing dealers, and than complainant regarded as for its best interests. *Held*, that such evidence was wholly insufficient to establish a right to relief.

4. SAME—RIGHT OF MANUFACTURER TO CONTROL PRICE OF GOODS—PURCHASE IN OPEN MARKET.

When a manufacturer parts with his goods, and they go upon the market, any third person has the right to purchase and sell them as he pleases; and the courts will not aid the manufacturer in suppressing their sale by a purchaser at prices which do not meet his approval by permitting him, in litigation brought under the guise of protecting his trade-mark or to suppress unfair competition, to examine the defendant or his witnesses to discover where the goods were purchased.

5. TEMPORARY INJUNCTION—PERVERSION OF USE—CONTEMPT OF COURT.

The publication in a newspaper, by a party to whom a temporary injunction has been granted, of a perverted construction of the purpose and effect of the injunction, before a full hearing on the merits, is a misuse of the injunction, which constitutes a common-law contempt of court.

This was a suit in equity by the Gorham Manufacturing Company against the Emery-Bird-Thayer Dry-Goods Company and others for unlawful competition in trade.

Brown, Chapman & Brown and Rufus J. Delano, for complainant.
John L. Peak and Robert E. Ball, for defendants.

PHILIPS, District Judge.    This is a bill in equity to enjoin the defendants from unfair competition with the business of complainant. The complainant is a nonresident corporation, engaged in manufacturing and selling silverware known generally in the trade as "Gorham Silverware." The defendant Emery-Bird-Thayer Dry-Goods Company is a domestic business corporation, engaged in general merchandise, conducting what is popularly known as a "department store." The other defendants are its directors and managing officers.    The question as to any invasion of complainant's trade-mark is eliminated from the discussion, for the reason that there is no evidence that the defendants have in any way attempted any imitation thereof.    The only real controversy presented by the evidence is whether or not the defendants have been guilty of unfair competition, by attempting to palm off on the purchasers of silverware, as of the manufacture of complainant, that which in fact was of a different manufacture.

A substantial recitation of the facts which led to the institution of this suit will be a sufficient defense thereto:

For two or three years prior to October, 1895, the concern doing business under the firm name of Emery, Bird, Thayer & Co., up to the time of the act of incorporation,—the latter part of October, 1895,—had bought and sold silverware of the manufacture of the complainant, as also silverware of other manufactures, and at the times in controversy had on hand a lot of complainant's product.    In the month of October, 1895, among its many advertisements in the newspapers of Kansas City, it advertised for sale silverware of the Gorham pattern at reduced rates,—below those of establishments in Kansas City engaged especially in the jewelry business.    Upon discovering this, the complainant—whether of its own motion, or at the instigation of another jewelry merchant in Kansas City, need not be determined—caused to be inserted in the Kansas City Star, on November 2, 1895, the following notice:

"Where to Buy Gorham Silver. Don't look for it among the silvery silver of the dry-goods stores, offered at half the price of bullion.  Suspicion instantly attaches to all such wares, no matter what they are stamped, or by whom they are sold.  On the contrary, the proprietor of any first-class jewelry store in the United States will stake his personal reputation upon the sterling quality of Gorham silver.  Too good for dry-goods stores; jewelers only."

This advertisement of the complainant was the only one of a like character it had ever published in any newspaper at Kansas City.    It was so evidently directed against the defendant company, that among its advertisements in the Kansas City Times of November 4, 1895, it inserted the following:

"Sterling Silver.  Gorham Silver.  We are now selling Gorham Sterling Silverware, made by the Gorham Manufacturing Co. of New York City, at from

20 to 40 per cent. below the exclusive jewelers. In a recent advertisement of the Gorham Co., they said their ware was 'too good for dry-goods stores; jewelers only.' A rather peculiar announcement for them to make, when we now have quantities of their ware in our store, and have been selling it for some years. Yes, if you want Gorham's ware, you can get it here, and the price will be from 20 to 40 per cent. below that of the exclusive jewelers. But the patterns of the Gorham Co. are not as pretty and original as those made by another big silversmith, and of which we sell a great deal more than of the Gorham ware. We are showing these patterns to-day alongside of the Gorham patterns, and the customers nearly invariably select the patterns not made by Gorham. It is simply this: The patterns of the Gorham Co. are too much like stamped plated ware. They are not up to date. Come to the store and compare these two kinds. You can have Gorham's ware, if you want it. We think you'll select the prettier, however."

On the 9th day of November, 1895, the complainant made the following publication in the Kansas City Journal:

"If it is Gorham, it is genuine. Of course, that goes without saying; but is it Gorham? Is it stamped with the lion, anchor, and the letter 'G' (trademark)? Don't buy so much as a teaspoon for solid silver, unless it bears this doubt-dispelling mark. Too good for dry-goods stores; jewelers only."

Thereafter one Meyer, a jeweler of Kansas City, in the interest of the complainant and himself, sent one of his female clerks to the defendant's store, with the evident purpose of obtaining, if possible, evidence to show that the defendant company was not in fact selling Gorham silverware; and naturally enough she found, as she supposed, what she went for. Her testimony in chief is to the effect that she asked for a Gorham spoon, and was shown by one of defendant's lady clerks a spoon represented to be of the Gorham manufacture, which she claims was of a different pattern. She did not buy the spoon, as she did not go there for the purpose of making a purchase. She could not give the name of the clerk with whom she talked, nor could she identify the person so as to enable the defendant to call her in contradiction. This witness was nearsighted, and on her cross-examination showed an unfamiliarity even with the Gorham trade-mark, or that of the spoon which she claims was exhibited to her; leaving the identification of the goods claimed to have been offered her in a very unsatisfactory condition. This was followed up by this same man, Meyer, procuring two other women, friends of his, to visit the defendant's store "to spy out the land." One of them claims to have bought for Meyer some spoons represented by the saleswoman to be of the Gorham pattern, which were not. The sale ticket for these goods did not express on its face the name of the manufacturer. They delivered the spoons to Meyer, one of which was marked the next day for identification, which was afterwards put in evidence by the witness Meyer. The lady clerk who made this sale is of good reputation, and experienced as a saleswoman. She testified that, while she could not recall the circumstances of the particular transaction, she was satisfied it was not possible for her to have sold the spoon exhibited by Meyer as of the Gorham pattern; that there was Gorham ware, such as spoons, in the case, the trademark of which she was familiar with; that she had never made any such misrepresentation to any purchaser, and could have had no occasion so to do. The readiness with which those two women lent

themselves to Mr. Meyer to perform the ungracious office of amateur detectives, does not commend itself to the favorable consideration of this court. A superserviceable detective is very apt to discover, in his eagerness to illustrate his fidelity to a self-imposed master, what he seeks. The persistent conduct of the complainant in sending spies upon the unsuspecting clerks of this house is calculated to excite some incredulity as to the virtue of this class of testimony. The evidence shows that next came an agent of the complainant, representing its business in the Western territory, who also entered this store under the guise of a purchaser, and applied to this same lady clerk for the purchase of a spoon. She distinctly told him that the spoon he bought was not of the Gorham pattern. Still determined to find some evidence, if possible, against the defendant company, he represented to her that he wanted the spoon to give to a friend out in Kansas who had a preference for the Gorham pattern, and persuaded her to write upon the duplicate sale ticket given him therefor the word "Gorham." This is verified by the fact that the duplicate sale bill which went to the defendant's accounting office did not contain the word "Gorham," which was written on the duplicate taken by said agent after it was returned from the accounting office to the clerk to be given to the purchaser. The clerk's evidence is that she reluctantly yielded to the agent's insistence, merely to oblige him, which act on her part, however reprehensible from a business point of view, certainly cannot be taken advantage of by the party who procured it. As the crowning performance along this line, the complainant's chief counsel came to Kansas City, and presented himself, incognito, at the counter of defendant's store, and bought a spoon from a young clerk named Sheldon, who, when inquired of by this assumed purchaser whether it was a Gorham spoon, answered that it was. The said lady clerk of the defendant, who was standing near, overheard a part of this conversation, and when she perceived that the young man had represented the spoon as of the Gorham pattern, which it was not, she confronted him with his misconduct, whereupon he went out to find this purchaser, to recall the sale; but the purchaser suddenly disappeared, and presumably went direct to Mr. Meyer's store to report his achievement. This lady clerk at once reported to her immediate superior what young Sheldon had done, and the matter was then carried before Mr. Peters, who had charge of the employment of the clerks for the house, who, according to the custom of the house, after allowing him to remain and receive pay for one day, discharged him for his misconduct. Whether or not this young man was really ignorant of the pattern of the spoon is in some doubt, but, for the purposes of this case, the doubt may be resolved against him. The evidence shows, without contradiction, that it was the well-known rule of this house that no goods were to be represented by the employés to customers to be other than what they were, and that all customers buying goods of the house which proved to be dissatisfactory had the right to return them within a reasonable time and receive back the purchase money. The evidence on the part of the complainant not only fails to show that any bona fide purchaser had ever been deceived in the matter of purchasing something else for

Gorham goods sold by this house, but, on the contrary, the evidence on behalf of the defendant shows that no such complaint had ever been made to the defendant; and, with the exception of the sale made by young Sheldon, the first intimation ever received by the agents or managing officers of the defendant company of any false sale of the Gorham goods was on the filing of this suit.

The whole history of the controversy enforces the conclusion that it had its inception in the fact that the defendant company was offering the Gorham ware on this market at a lower price than that sought to be maintained by the exclusive jewelry establishments, and that the real incentive of the complainant's interposition was to maintain the higher price for its wares in this market. If the sole purpose of the complainant was to protect its trade-mark and to suppress unfair competition, within the spirit of the law, in the honest belief that the defendant company was palming off on the community spurious wares, or other wares, as those of the complainant, both conventional usage and equity, founded in fair play, demanded that the complainant should have gone to the defendant company and advised it of its grievance, and thus afforded the defendant the opportunity to correct the wrong without a hasty resort to court. The character and reputation of the defendant company, so well known to the community and the country, are such as to have invited this course. The supreme court, in McLean v. Fleming, 96 U. S. 254, declared the law to be that it is not necessary, "in order to give the right to an injunction, that a specific trade-mark should be infringed; but it is sufficient that the court is satisfied that there was an intent on the part of the respondent to palm off his goods as the goods of the complainant, and he persists in so doing after being requested to desist,"—citing Woollam v. Ratcliff, 1 Hem. & M. 259, in which the chancellor said:

"It further appears that Eaton had given this information to the plaintiff so long ago as December last, and the plaintiff ought, therefore, to have done one of two things: Either he should have communicated at once with Ratcliff, and obtained from him the information which he has given here; or else, if he had determined on applying to this court in the first instance, he should have taken care to show that some one else had been deceived."

Furthermore, as said by Brown on Trade-Marks (2d Ed., § 43):

"Unfair competition implies a fraudulent intention, while, on the contrary, an enjoinable infringement of a technical trade-mark may be the result of accident or misrepresentation, without actual fraud being an element."

This principle of law is aptly stated in Simmons Med. Co. v. Mansfield Drug Co., 23 S. W. 175, 93 Tenn. 84:

"Fraudulent intention is not necessary, in a trade-mark, while in unfair competition fraud is of the essence."

So, in Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537–549, 11 Sup. Ct. 396, the court said:

"In cases of unfair competition, fraudulent intent upon the part of the defendant must be proven."

In Hilson Co. v. Foster, 80 Fed. 897, Judge Coxe said:

"The action is based upon deception, unfairness, and fraud, and when these are established the court should not hesitate to act. Fraud should be generally proved. It should not be inferred from remote and trivial similarities. Ju-

dicial paternalism should be avoided. There should be no officious meddling by the court with the petty details of trade, but, on the other hand. its process should be promptly used to prevent an honest business from being destroyed or invaded by dishonest means."

Nobody was deceived or defrauded into the sales claimed to have been made to the detectives sent to the defendant's store to get evidence. They knew exactly what they were getting. The conduct of complainant's agent, who, by deceit and falsehood, induced the saleswoman to mark on the sale ticket the word "Gorham," shows that the scheme and purpose were to procure a wrongful act, to make it the basis of a lawsuit. A man who procures another to slander him cannot make it the basis of an action for damages. Sutton v. Smith, 13 Mo. 120. This is based upon the fundamental principle that "no person has the right to entrap another, by false and fraudulent appearances, in order to induce an act on which to base a claim for damages in a court of justice." How much more should this rule apply in a court of equity, which, in its search after justice, looks into the very heart, to divine the motive.

As confirmatory proof of the underlying purpose of this suit to prevent the defendant company from selling the complainant's manufactured article at prices which might affect the larger profits of the manufacturer, and suppress the competition of other merchants with the exclusive jewelry establishments, the complainant, both in the interrogatories propounded in the bill, and persistently throughout the cross-examination of the directors, managers, and officers of the defendant company, sought to ascertain from whom they purchased the goods manufactured by the complainant, the evident object of which was to enable it to refuse to sell to defendant's venders after ascertaining their names. During the taking of the depositions, on the refusal of one of the witnesses to make answer to such inquiries, the respective counsel laid the matter before this court for direction as to whether or not such question should be answered; and the court answered in the negative, for the obvious reason that that was a trade secret, and the development of the fact was not essential to the proper maintenance of the complainant's suit. When a manufacturer parts with his goods, and they go upon the market, any third person has the right to purchase and sell them as he pleases, without the consent of the manufacturer; and the courts will not aid the manufacturer, under the guise of protecting his trade-mark or the suppression of unfair competition, by permitting him in such litigation to discover the sources from which an objectionable merchant—to him—obtains his supply.

This complainant has been guilty of an act which entitles it to less consideration from this court. After it had been conceded a temporary injunction in this case, it published in one of the leading newspapers of this city a perverted construction of the purpose and effect of the temporary injunction. This publication, in effect, represented the court as having decided, in granting said injunction, that the court was of opinion that the defendant company had obtained its goods "through second hands, and surreptitiously. * * * Consequently the injunction was granted, and is in active force to-day."

Such perverted use of a temporary injunction granted by a court before the final hearing upon the full evidence is, in its essence, a common-law contempt of court. Tichborne v. Tichborne, 39 Law J. Ch. 403, 404; Roach v. Garvan, 2 Dick. 794; Kitkat v. Sharp, 52 Law J. Ch. 134. The court is unable to perceive the existence of any real purpose on the part of the defendant company to impose upon the public by fraudulently putting upon the market other goods under the guise of the complainant's manufacture, or any purpose on its part, prior to the complainant's attack upon it through the newspapers, to give any preference to other wares sold by it over those of the complainant. The very utmost the evidence warrants the court in saying against the defendant company, assuming the evidence of complainant's witnesses to have been honestly related, is that some of the minor clerks of the house may, through inadvertence or indifference, have disposed of to Meyer and complainant's agents a few spoons of other patterns as of the make of the complainant. The evidence, taken in its entirety, persuades the court that this was without the knowledge or consent of the defendant company, and was contrary to its declared method of doing business, and, further, that no conceivable reason is found to exist at the time of the sales in question why the defendant company should have sold other goods as those of the complainant, when alongside of those sold were those of the complainant, subject to the same discount, and when, according to the defendant's testimony, it did not regard those of other manufacturers less valuable than those of the complainant. There is a lack of persuasive evidence of the existence of any fraudulent purpose on the part of the defendant company; and the failure of this complainant to have afforded the defendant an opportunity, before bringing this suit, to rectify any misconduct on the part of its employés, compels the court, in the interest of fair play, to dismiss this bill, and dissolve the temporary injunction granted herein. Decree accordingly.