IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 15, 2019 Session

## JOHN R. FULLER v. COMMUNITY NATIONAL BANK

**Appeal from the Chancery Court for Hamilton County**
No. 17-0630    Pamela A. Fleenor, Chancellor

———

**No. E2018-02023-COA-R3-CV**

———

Plaintiff John R. Fuller invested more than a million dollars with Jack Brown, who, unbeknownst to Fuller, was running a Ponzi scheme that eventually resulted in Brown's involuntary bankruptcy and significant losses to numerous investors. Brown had several accounts with Community National Bank (the bank). Brown later died and plaintiff was unsuccessful in recovering from him or his estate. In this action, plaintiff sued the bank, alleging negligence; fraud; aiding and abetting Brown's fraud and breach of contract, unjust enrichment, and breach of fiduciary duty; and violations of Tennessee's versions of the Uniform Fiduciaries Act, Tenn. Code Ann. § 35-2-101 (2015) *et seq*., and Uniform Commercial Code, Tenn. Code Ann. §§ 47-3-307(b)(2) and 47-3-402(a) (2001). The trial court granted the bank summary judgment. It held plaintiff's action was barred by the equitable doctrine of unclean hands, based on its finding that plaintiff "was using Brown to launder his ill-gotten gains," namely, "upwards of one million dollars in cash [plaintiff kept] in safes to avoid paying income tax . . . accumulated from poker machines in his store." The trial court further held that plaintiff's UCC claims were barred by the applicable three-year statute of limitations, Tenn. Code Ann. § 47-3-118(g); that plaintiff "set forth no facts that demonstrate a genuine issue that [the bank] had knowledge of any breach of Brown's fiduciary duty or had knowledge of such facts that its actions . . . amounted to bad faith"; that plaintiff's common law claims were displaced by the UCC; that he could not establish an unjust enrichment claim because he did not confer any benefit upon the bank; and that plaintiff failed to establish any damages stemming from the bank's conduct. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Whitney Durand, Chattanooga, Tennessee, for the appellant, John R. Fuller.

Joseph R. White and Joseph Alan Jackson II, Chattanooga, Tennessee, for the appellee, Community National Bank.

**OPINION**

**I.**

Jack Brown ran a business called Brown's Tax Service. He also was licensed to sell annuities for several insurance companies. Brown persuaded plaintiff to buy two annuities from Allianz Life Insurance Company for about $600,000. Not long thereafter, Brown convinced plaintiff to withdraw the money from the annuities and invest it directly with Brown. Plaintiff processed the withdrawal applications and sent them to Allianz, which mailed checks to plaintiff at his post office address of record. Brown intercepted these mailings, fraudulently forged plaintiff's endorsements on the checks, and deposited the money into his business checking account with the bank held by Brown's Tax Service. The bank's records show that during the second half of 2008, Brown presented five checks from Allianz, purportedly bearing plaintiff's endorsement signature, which totaled $292,853.46. Plaintiff also loaned Brown approximately $948,000, evidenced by promissory notes from Brown to plaintiff, based on Brown's assurances that he could invest the money and earn a high rate of return.

Plaintiff owned and operated a gas station and convenience mart in the Soddy-Daisy area. He testified that he received shipments of gasoline and diesel fuel from Benton Oil Company, but because Benton "had a messed up bookkeeping system" and a "malfunctioning computer," it failed to bill plaintiff for over a million dollars' worth of fuel. When Benton caught the error, it eventually billed plaintiff $485,000. Plaintiff got the money to pay the bill from Brown, who wrote him five checks drawn on the Brown's Tax Service account in total amount of $485,000. The ten above-referenced checks − five from Allianz to plaintiff bearing forged endorsements and misappropriated by Brown, totaling $292,853.46, and five drawn from the Brown's Tax Service account to plaintiff totaling $485,000 − are the only financial transactions involving plaintiff and the bank.

Plaintiff owned eight video poker machines that were in his convenience store, which customers would use for gambling, that plaintiff testified were "played heavy." He put the cash profits from the machines in three safes. At times he had over a million dollars in cash stored there. Plaintiff testified as follows:

2

Q:  You would, from time to time, deliver to Jack, in some --
what?  In a briefcase or in a big box or --

A:  Garbage bag.  I mean, a big brown paper sack.

Q:  A big paper sack.  What was the -- how much money
would you give him at a time?  Fifty thousand?  A hundred
thousand?

A:  At least a hundred thousand most of the time.  One time,
fifty thousand.

*     *     *

Q:  And did you hand over to Mr. Brown a million dollars in
cash?

A: Yes.

*     *     *

Q:  And where did you have -- where did the other premium
for the Allianz annuities come from?

A:  Out of my safe.  I took money out of my safe and put it in
the bank.  No, I didn't put that in the bank.  I give it to Jack
Brown, and Jack Brown probably run it through his check-
cashing deal.

*     *     *

Q:  And why did you not -- why did you not put it in the
bank?

A:  I didn't feel comfortable doing that.

Q: And why is that?

A: Well, for one reason, I wanted to accumulate cash and
evade paying tax -- income tax on it.

3

Brown's Ponzi scheme eventually collapsed when he ran out of money. Involuntary bankruptcy proceedings commenced against him on November 9, 2012. According to the complaint, 171 claims were filed against Brown, totaling $13,529,421. The amended complaint further alleges that

> Brown died on August 31, 2013. [Plaintiff] filed a claim as an unsecured creditor for $947,759 that related to three loans he made to Brown as a part of the Ponzi scheme. . . . [Plaintiff] did not know that he had become a victim of the Ponzi scheme until the bankruptcy proceedings. He did not know about Brown's unauthorized withdrawals from the Allianz annuities until February 2015 during discovery proceedings in a lawsuit. Consequently, he filed no bankruptcy claim regarding the Allianz annuities[.]

On July 15, 2015, plaintiff filed a complaint against the bank and Allianz. He voluntarily nonsuited that case, and then refiled the current action against the bank alone on August 24, 2017. On May 29, 2018, plaintiff filed a "motion to exclude references to prior conduct," in which he stated that he

> moves the Court to exclude any direct or indirect reference by the [bank] of John or Elizabeth Fuller's ownership or operation of a gaming device or the failure of either of them to report income or receipts from it on a federal, state or local tax return or other type of report.

Plaintiff stated that "[t]he ownership and operation of a gaming device is a Class B misdemeanor"; "[t]he failure to report the money received from users of a gaming device and to pay sales tax on it is arguably a Class E felony"; and "[t]he failure to report income on a federal tax return is a felony." Plaintiff argued that his violation of state and federal criminal statutes may not be used against him "in a civil case that has no similarity to those acts." The trial court entered an order deferring its ruling "given the uncertainty of the relief requested" and held that "Plaintiff may renew his request when defendant makes a specific offer of evidence or as otherwise appropriate."

Following discovery, the bank moved for summary judgment. In a thorough 33-page order, the trial court granted the bank summary judgment on all claims. The trial court applied the unclean hands doctrine to bar plaintiff's action, holding that his "prior conduct is indeed connected to this litigation, and the relief he seeks, *i.e.* the return of his ill-gotten gains, is inseparably connected with his own prior fraud." In the interest of judicial economy and efficiency, the court ruled alternatively upon all of the remaining

4

issues. Regarding plaintiff's UCC claims for breach of fiduciary duty under Tenn. Code Ann. § 47-3-307(b) and conversion under § 47-3-420(a), the trial court held that the three-year statute of limitations at § 47-3-118(g) applies, it began to run in 2008 when the checks at issue were negotiated, and plaintiff's action initially filed in 2015 was not timely. Regarding the Uniform Fiduciary Act (UFA) claim under Tenn. Code Ann. § 35-2-104, the trial court held it required two elements: "(1) that a negotiable instrument was 'payable or endorsed to a fiduciary *as such*' AND (2) that the endorsee had knowledge of the breach of fiduciary duty or had such knowledge of such facts that its action in taking the instrument amounts to bad faith." (Emphasis in original). The court held that the undisputed material facts established that plaintiff could demonstrate neither of these elements. The trial court made a similar finding regarding the closely-related UFA claim under Tenn. Code Ann. § 35-2-107. Regarding the UFA claim under Tenn. Code Ann. § 35-2-109, the trial court held that statute to have been impliedly repealed by the enactment of Tenn. Code Ann. § 47-3-307, as held by this Court in ***C-Wood Lumber Co. v. Wayne Cnty. Bank***, 233 S.W.3d 263, 278 (Tenn. Ct. App. 2007). The trial court also followed the holding in ***C-Wood*** that that "the UCC effectively displaced any common-law claims that [plaintiff] may have been asserting." ***Id.*** Plaintiff's unjust enrichment claim was dismissed because he could not prove that he had conferred a benefit upon the bank, an element of such a claim. The trial court held that Tennessee law does not provide for a claim of aiding and abetting a breach of contract. The court further held that the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104(b)(27), "does not provide a cause of action for aiding and abetting a TCPA violation." The trial court rejected plaintiff's claim for aiding and abetting fraud based on its ruling that the bank established that it "had no knowledge of Brown's conduct prior to his bankruptcy and further established that [the bank] did not provide substantial assistance to Brown." Finally, the court ruled that plaintiff did not establish any compensatory damages in this case because the transactions involving him and the bank resulted in a net positive to plaintiff in the amount of $192,146.54. Plaintiff timely filed a notice of appeal.

## II.

The issues on appeal are quoted from plaintiff's brief as follows:

> The issues are whether the trial court erred in granting the motion of [the bank] for summary judgment by holding that:
>
> 1. The knowledge of [the bank] about the existence of a Ponzi scheme perpetrated by its customer, Brown, is a question of fact that can be decided on a motion for summary judgment.

5

2. The question of whether [the bank] gave substantial assistance to Brown in maintaining the Ponzi scheme is one that can be decided on a motion for summary judgment.

3. Tenn. Code. Ann. 47-18-104(b)(27), a part of Tennessee's Consumer Protection Act, precludes the bringing of this case by a person other than the Attorney General of Tennessee.

4. Tennessee law does not permit the maintenance of an action for aid and assistance to a breach of contract.

5. The following questions can be decided on summary judgment pursuant to Tennessee's Uniform Fiduciary Act: (a) whether [the bank] knew that Brown was a fiduciary with respect to [plaintiff], (b) whether it knew that Brown was committing a breach of his obligations to [plaintiff], or (c) whether it had knowledge of such facts that its actions in depositing checks to Brown's account that were payable to [plaintiff] amounts to bad faith.

6. [Plaintiff's] claims under Tennessee's Uniform Commercial Code are barred by a statute of limitations.

7. [The bank] has not been unjustly enriched.

8. [Plaintiff's] ownership and operation of gambling devices and failure to report income from them on tax returns precludes his seeking relief in this litigation.

(Emphasis in original omitted.)

### III.

In the recent case of ***TWB Architects, Inc. v. Braxton, LLC***, 578 S.W.3d 879 (Tenn. 2019), the Supreme Court set forth the following guidance on our standard of review of summary judgment:

> A trial court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

6

the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In reviewing a trial court's ruling on a motion for summary judgment, we make a fresh determination about whether the requirements of Rule 56 have been met. *Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 250 (Tenn. 2015). Our review of the trial court's ruling is de novo, with no presumption of correctness. On review, we accept the evidence presented by . . . the nonmoving party as true; allow all reasonable inferences in its favor; and resolve any doubts about the existence of a genuine issue of material fact in favor of [the nonmoving party].

In *Rye*, we stated our holding as follows:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye*, 477 S.W.3d at 264.

In *Rye*, we intended to "correct course, overrule *Hannan* [v. *Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008)], and fully embrace the standards articulated in the *Celotex* trilogy." *Id*. *Hannan*'s summary judgment standard that "a moving party who [does not bear the burden of proof at trial] must either (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim *at trial*" had proven to be unworkable. *Hannan*, 270 S.W.3d at 8–9 (emphasis added).

We intended for the summary judgment standard adopted in *Rye* to apply to all parties, no matter which party filed the motion for summary judgment.

7

\* \* \*

> [I]f the moving party bears the burden of proof on the challenged claim at trial, that party must produce at the summary judgment stage evidence that, if uncontroverted at trial, would entitle it to a directed verdict. ***Celotex Corp. v. Catrett***, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) (citations omitted). The burden then shifts to the nonmoving party to produce evidence showing that there is a genuine issue of fact for trial. ***Id***. On the other hand, when the nonmoving party has the burden of proof at trial, the burden shifting is the same as that set forth by this Court in ***Rye***—the moving party may either negate an essential element of the nonmoving party's claim or show that the nonmoving party does not have sufficient evidence to prove an essential element of its claim. ***Id***. (citations omitted).

\* \* \*

> The emphasis under the ***Rye*** standard is the evidence *at the summary judgment stage*. Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, "[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." ***Rye*** at 265. This is the standard Tennessee courts must apply when ruling on summary judgment motions regardless of which party bears the burden of proof at trial.

*TWB Architects*, 578 S.W.3d at 887-89 (emphasis and brackets in original; internal citations omitted).

## IV.

### A. Unclean Hands Doctrine

As this Court has recently observed,

The doctrine of unclean hands is a maxim of equity that allows a court "to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007) (footnote omitted). A court of equity cannot be used to aid a party in "profiting from [his or] her own misconduct." *Emmit v. Emmit*, 174 S.W.3d 248, 253 (Tenn. Ct. App. 2005). But this defense has limitations: "it must be confined to the particular matter in litigation and the conduct complained of must have injured the party making the complaint." *Edmisten v. Edmisten*, No. M2001–00081–COA–R3–CV, 2003 WL 21077990, at *7 (Tenn. Ct. App. May 13, 2003); *see Nolen v. Witherspoon*, 187 S.W.2d 14, 16 (Tenn. 1945); *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 352–53 (Tenn. Ct. App. 2009).

*Williams v. Hirsch*, No. M2016-00503-COA-R3-CV, 2018 WL 2383612, at *7 (Tenn. Ct. App., filed May 25, 2018) (brackets in original). In *In re Estate of Boote*, we noted that "[a]ny willful act regarding a litigated matter which would be condemned and pronounced as wrongful by fairminded persons is sufficient to trigger the doctrine of unclean hands." 265 S.W.3d 402, 417 n.26. "The application of the doctrine of unclean hands is within the chancery court's discretion, and we review the court's decision under the abuse of discretion standard." *Spirit Broadband, LLC v. Armes*, No. M2015-00559-COA-R3-CV, 2017 WL 384248, at *5 (Tenn. Ct. App., filed Jan. 27, 2017) (quoting *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009)).

The facts pertinent to the inquiry of whether the trial court abused its discretion in applying the unclean hands doctrine are undisputed. They are established almost entirely by plaintiff's own deposition testimony, which we have quoted above. The trial court found as follows:

[The bank] established that Plaintiff kept upwards of one million dollars in cash in safes to avoid paying income tax. He accumulated this cash from poker machines in his store. When the IRS audited [plaintiff], he did not disclose the money in his safe. Plaintiff took this cash in brown paper bags to Brown in exchange for Allianz annuities and promissory notes. Plaintiff took a $750,000 capital loss on these promissory notes on his 2012 income tax return.

9

Plaintiff cancelled his annuities and when Allianz refunded the annuity checks, Brown deposited them into his [Brown's Tax Service] account then cut other checks to Plaintiff.

\*    \*    \*

Plaintiff did not dispute these facts. Plaintiff just argues his prior deeds are not connected with this litigation. This Court disagrees.

Chapter 14 of Title 39 is entitled "Money Laundering Offenses."

T.C.A. § 39-14-903(a)(1) provides:

> It is an offense to knowingly use, conspire to use or attempt to use conduct or attempt to conduct a financial transaction or make other disposition with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds.

What the Court determines is that, in actuality, Plaintiff was using Brown to money launder his ill-gotten gains. This Court is cognizant that it is not trying a criminal case against Plaintiff for money laundering. This Court is further aware that in ruling on this motion it must view the evidence in the light most favorable to Plaintiff. However, Plaintiff did not dispute these facts. Nor did Plaintiff submit an affidavit providing any other explanation for his conduct.

On appeal, plaintiff does not challenge any of the trial court's factual findings, but continues to argue that his unlawful conduct is too attenuated and distant to relate to his action against the bank.

As the Supreme Court stated over a century ago,

> The principle is general, and is one of the maxims of the court, that he who comes into a court of equity, asking its interposition in his behalf, must come with clean hands; and if it appears from the case made by him or by his adversary that

10

he has himself been guilty of unconscionable, inequitable, or immoral conduct in and about the same matters whereof he complains of his adversary, *or if his claim to relief grows out of or depends upon or is inseparably connected with his own prior fraud*, he will be repelled at the threshold of the court.

*C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893) (emphasis added); *accord Spirit Broadband*, 2017 WL 384248 at *6. In this case, plaintiff's own testimony draws a straight line from the money he unlawfully gained by his illegal video poker machines, hid from the IRS in acts of tax fraud, and tried to "launder" through Brown via cash deliveries in brown paper bags, to the funds he is trying to recover from the bank, based on its transactions with Brown. Under these circumstances, we cannot say that the trial court abused its discretion in applying the unclean hands doctrine to reject plaintiff's claims. In *Southern Coal & Coke Co. v. Beech Grove Mining Co.*, 381 S.W.2d 299, 303 (Tenn. Ct. App. 1963), this Court made the following apt observation:

> Conscience does not defile itself in sanctioning the enforcement of a just and clean cause of action, even though attempts may have been made to improperly influence its favor; but when it actively interposes its aid to secure the fruits of unfair and unscrupulous dealings, it becomes a party to the scheme and encourages the practice of devious ways that corrupt the place of its habitat.

The trial court correctly noted that its finding of unclean hands is dispositive and fatal to plaintiff's claims. *See C.F. Simmons Med. Co.,* 23 S.W. at 168; (claimant with unclean hands "will be repelled at the threshold of the court"); *Segal v. United American Bank*, No. W2004-02347-COA-R3-CV, 2005 WL 3543332, at *5 (Tenn. Ct. App., filed Dec. 28, 2005); *Alexander v. JB Partners,* 380 S.W.3d 772, 776 (Tenn. Ct. App. 2011) ("Once found to exist, the doctrine of unclean hands repels the unclean plaintiff at the steps of the Courthouse"). However, the trial court also fully addressed and disposed of all of plaintiff's claims and issues in the alternative, in the interest of judicial economy and efficiency. We will do the same.

## B. Uniform Commercial Code Claims

Plaintiff brought claims under the UCC for breach of fiduciary duty and for conversion. Tenn. Code Ann. § 47-3-307 provides, in pertinent part, as follows:

(b) If (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

(1) Notice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person.

(2) In the case of an instrument payable to the represented person or the fiduciary as such, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person.

Regarding plaintiff's conversion claim, Tenn. Code Ann. § 47-3-420 states:

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee.

\* \* \*

(c) A representative, including a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

12

The applicable statute of limitations in found at Tenn. Code Ann. § 47-3-118(g), stating:

> Unless governed by other law regarding claims for indemnity or contribution, an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty, or (iii) to enforce an obligation, duty, or right arising under this chapter and not governed by this section must be commenced within three (3) years after the cause of action accrues.

In *C-Wood Lumber Co.*, this Court held as follows:

> The statute of limitations in Tenn. Code Ann. § 47–3–118(g) begins to run when the fiduciary or corporate employee negotiates each check. The Tennessee Supreme Court, noting that "[n]egotiable instruments are intended to facilitate the rapid flow of commerce by providing certainty and finality in commercial transactions," has explicitly declined to apply the discovery rule to actions involving the conversion of negotiable instruments. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 623–24 (Tenn. 2002).

233 S.W.3d at 283 (internal citations omitted). In this case, the five checks at issue were negotiated by Brown in 2008. Plaintiff initially brought an action against the bank in 2015. Plaintiff acknowledges the holdings in *C-Wood* and *Pero's Steak & Spaghetti House*, but argues that the Supreme Court recognized an exemption to its holding when a plaintiff can establish fraudulent concealment. *Pero's Steak & Spaghetti House*, 90 S.W.3d at 624 ("Absent fraudulent concealment, three years should be more than ample time for a plaintiff to discover a conversion claim."). The High Court in *Pero's* examined the fraudulent concealment claim and affirmed the trial court's grant of summary judgment, stating:

> In *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn.1998), this Court explained that to establish fraudulent concealment, a plaintiff must prove the following: (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) that the defendant had knowledge of the facts giving rise to the cause of action; and (4) that the defendant concealed

13

material facts from the plaintiff by withholding information or making use of some device to mislead the plaintiff, or by failing to disclose information when he or she had a duty to do so. *Id.* at 735–36.

\* \* \*

. . . the plaintiffs have failed to establish a genuine issue of material fact as to fraudulent concealment. Even assuming a genuine issue of material fact exists as to the other required elements, our review of the voluminous record reveals that no genuine issue of material fact exists as to First Tennessee having "had knowledge of the facts giving rise to the cause of action." The plaintiffs' assertion that, for purposes of fraudulent concealment, First Tennessee should be charged with such knowledge because it had a duty to inquire as to the maker's intent with respect to the special deposits is without merit. Fraudulent concealment requires proof of actual knowledge. *See Ray v. Scheibert*, 484 S.W.2d 63, 72 (Tenn. Ct .App.) (cert. denied 1972) (cited with approval [in] *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn.1992)); *Whaley v. Catlett*, 103 Tenn. 347, 356, 53 S.W. 131, 134 (1899) ("Certainly, we would not be justified in assuming fraud in order to prevent the running of the statute of limitations."). This record contains no proof indicating that First Tennessee had actual knowledge that Lee was mishandling the plaintiffs' checks. Instead, the facts indicate that First Tennessee was negligent in following its own procedures, and as a result, lacked knowledge of the facts giving rise to the cause of action.

*Id.* at 625. A similar situation is presented here. In the present case, plaintiff has presented no evidence suggesting that the bank had actual knowledge of Brown's mishandling of the checks from Allianz to plaintiff. Moreover, in plaintiff's response to the bank's motion for summary judgment, he stated that he "does not presently possess proof of all of these elements [of a fraudulent concealment claim] but may have it at trial." The Supreme Court, in *Rye* and *CWB Architects*, has made it abundantly clear that although a party should be given fair opportunity and time to discover and provide evidence supporting a claim, saying "I might be able to get some proof before trial" does not shield one from a properly-supported summary judgment motion. We affirm the

14

judgment of the trial court that plaintiff's UCC claims were barred by the statute of limitations.

## C. Uniform Fiduciary Act Claims

Plaintiff brought a claim under Tenn. Code Ann. § 35-2-104, which provides as follows:

> If any negotiable instrument payable or endorsed to a fiduciary as such is endorsed by the fiduciary, or if any negotiable instrument payable or endorsed to the principal is endorsed by a fiduciary empowered to endorse such instrument on behalf of the principal, *the endorsee is not bound to inquire whether the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in endorsing or delivering the instrument*, and is not chargeable with notice that the fiduciary is committing a breach of the obligation as fiduciary unless the endorsee takes the instrument with actual knowledge of such breach or with knowledge of such facts that the action in taking the instrument amounts to bad faith. If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of the obligation as fiduciary in transferring the instrument.

(Emphasis added). Based on the italicized portion quoted above, the trial court held that, assuming *arguendo* that the bank is an "endorsee," it was not required to inquire whether Brown was breaching a fiduciary duty to plaintiff in negotiating the checks with forged endorsements. The court also cited and relied upon our opinion in ***Copper Cellar Corp. v. Miller***, No. 03A01-9607-CV-00239, 1997 WL 206798, at *6 (Tenn. Ct. App., filed Apr. 29, 1997), wherein we interpreted the statute at issue as follows:

> We acknowledge that the cashier's check in this case constitutes a negotiable instrument that was payable to Taylor, Copper Cellar's fiduciary. However, T.C.A. § 35-2-104 only applies to negotiable instruments "payable or endorsed to a fiduciary *as such*." ***Id.*** (emphasis added). The cashier's check at issue here was made payable simply to

15

> "Taylor and Associates." It contained no reference to Taylor's or Taylor and Associates' status as a fiduciary of Copper Cellar. Thus, T.C.A. § 35-2-104 is not applicable to the facts of this case, and Copper Cellar's claim under that provision is without merit.

The trial court correctly held that the checks at issue here similarly did not refer to Brown as a fiduciary. As in *Copper Cellar*, Tenn. Code Ann. § 35-2-104 is inapplicable to the facts in the present case.

Tenn. Code Ann. § 35-2-107 states, in pertinent part, as follows:

> If a deposit is made in a bank or savings institution to the credit of a fiduciary as such, the bank or savings institution is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank or savings institution pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.

For plaintiff to state a cause of action under this statute, he must demonstrate that (1) a deposit was made with the bank to the credit of "a fiduciary as such" and (2) the bank (a) had actual knowledge that Brown was breaching his fiduciary obligation in drawing the checks or (b) had knowledge of such facts that the bank's action in paying the checks amounted to bad faith. As the trial court found, the bank "established that none of the checks at issue were payable or endorsed to a fiduciary 'as such.'"

There is no evidence in the record establishing that the bank had actual knowledge that Brown was plaintiff's fiduciary. Brown deposited the money from the checks into his Brown's Tax Service account. Assuming *arguendo* that an account in the name of a "tax service" places the bank on notice of a fiduciary relationship, we proceed to examine what the undisputed facts show regarding the bank's knowledge and whether it could possibly be found to have been acting in bad faith. These concepts were examined at length by the federal district court in *McLemore v. Regions Bank*, 2010 WL 1010092 (M.D. Tenn., filed Mar. 18, 2010), *affirmed on other grounds*, *McLemore v. Regions*

16

***Bank***, 682 Fed.3d 414 (6th Cir. 2012).[1]  The ***McLemore*** court quoted this Court's explanation of the UFA's purpose in ***C-Wood***, wherein we stated:

> The UFA was designed to facilitate banking transactions by relieving depositary banks of the responsibility of assuring that an authorized fiduciary used entrusted funds for proper purposes.  It is based on the assumption that a fiduciary will properly apply funds entrusted to him or her, and it places the burden on the principal to employ honest fiduciaries.  It also specifically rejects the idea that negligence on the part of a third person dealing with a fiduciary is sufficient to shift the risk of fiduciary misconduct from the principal to the third party.

2010 WL 1010092, at *5 (quoting ***C-Wood***, 233 S.W.3d at 274) (internal citations omitted in original).  ***McLemore*** further states as follows:

> a bank is liable to a principal for a fiduciary's illegal withdrawal or transfer of funds if, and only if, the bank had "actual knowledge" that the fiduciary was breaching his or her fiduciary duty or had "knowledge of such facts that its action . . . amounts to bad faith." Tenn. Code Ann. §§ 35–2–107, 35–2–109.  Anything less is insufficient to support liability.
>
> The UFA does not define "bad faith," although it does define "good faith": "A thing is done 'in good faith,' within the meaning of this chapter, when it is in fact done honestly, whether it is done negligently or not." ***Id***. § 35–2–102(b). The obvious implication is that a bad-faith act is done dishonestly.
>
> Only a handful of Tennessee courts have addressed the meaning of "bad faith."  In ***McConnico v. Third National Bank***, 499 S.W.2d 874 (Tenn. 1973), the court, although primarily discussing "bad faith" under the Uniform Commercial Code, equated bad faith with dishonesty. ***Id***. at 881–82 (discussing Tenn. Code Ann. § 35–2–109, which was

---

[1] The district court's decision interpreting Tennessee's version of the UFA, Tenn. Code Ann. § 35-2-107, as regards the concepts of a bank's knowledge of violation of a fiduciary duty and bad faith, was not appealed to the Sixth Circuit. ***McLemore***, 682 Fed.3d at 424-25.

17

then numbered section 35–210, and holding that "there is no showing of such conduct as would evidence dishonesty and consequently such bad faith under the [UCC] statute"); see also *C–Wood Lumber*, 233 S.W.3d at 284 (noting that, under the UFA, a plaintiff must "prove [ ] that the bank was acting dishonestly").

\* \* \*

In applying the UFA, courts in other jurisdictions have consistently held that a bank acts in bad faith if "the facts and circumstances [surrounding the fiduciary's breach] are so cogent and obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." In other words, whether a bank has acted in bad faith turns on whether it knew facts that were sufficiently suggestive of the fiduciary depositor's breach of duty.

This requires more than a showing that the bank was negligent. *C–Wood Lumber*, 233 S.W.3d at 274; *see also* ***O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.)***, 118 F.3d 1246, 1251 (8th Cir.1997) (" 'Bad faith' requires something more than mere negligence and can be found where the [bank] disregards circumstances that are suggestive of a breach and are sufficiently obvious such that it is in bad faith to remain passive.") (applying Missouri law). As the Supreme Court of Pennsylvania has explained, negligence does not negate a bank's good faith:

> Even a failure to inquire under suspicious circumstances will not negate "good faith," unless the failure to do so is due to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction. Conversely, if a bank has knowledge that a fiduciary intends to appropriate trust funds to his own use, and that to release funds to him will aid a breach of trust, then the bank will be held to have acted in "bad faith."

18

> *Robinson Protective Alarm Co. v. Bolger & Picker*, 512 Pa.
> 116, 516 A.2d 299, 304 (Pa. 1986) (citations omitted), quoted
> in *In re Mushroom Transp. Co.*, 382 F.3d 325, 344 (3d
> Cir.2004).
>
> Thus, to show that the defendant had "knowledge of such
> facts that its action . . . amounts to bad faith," Tenn. Code
> Ann. §§ 35–2–107, 35–2–109, the plaintiffs must show that
> the circumstances surrounding Stokes' and 1Point's
> transactions so clearly suggested a breach of fiduciary duty
> that Regions' failure to investigate was a conscious effort to
> avoid knowledge of Stokes' wrongdoing. The plaintiffs
> cannot merely show that the defendant was negligent in not
> discovering Stokes' fraud or not undertaking reasonable
> efforts to monitor its depositors.

*McLemore*, 2010 WL 1010092, at *5-7 (internal citations and footnotes omitted; brackets
in original).

In the present case, the evidence that sheds light on the question of what the bank
knew, and when it knew it, is contained in excerpts from the depositions of several bank
officers, including its president, former vice president and Bank Secrecy Act officer,
former loan officer, and former manager at the branch Brown did his banking. Also in
the record is the unsworn declaration of the bank's CFO and senior vice president.[2]
There is nothing in this testimony that suggests any employee of the bank had knowledge
that Brown was committing a breach of his fiduciary duty in depositing the checks to his
business account. There is nothing in the record that suggests the bank was aware of
Brown's forgeries of plaintiff's signature, or that it had any reason to suspect them. The
bank employees testified that they did not suspect Brown of any wrongdoing, nor did
they have any reason to, until, at the earliest, shortly before the bankruptcy proceedings
began against Brown. This time frame is some three to four years after the checks to
plaintiff were deposited. Plaintiff himself testified as follows:

> Q: Do you know people in the community – has anybody
> ever told you that the bank did something wrong in this whole
> situation?

---

[2] Plaintiff proffered the testimony of Jerrold D. Farinash, the bankruptcy trustee in the
involuntary bankruptcy cases of Brown, his wife, and Brown's Tax Service. The trial court ruled that
Farinash's testimony "is inadmissible both as a lay witness and as an expert witness," and plaintiff has not
appealed that ruling.

A: In the community, no.

Q: No one has ever told you that the bank did anything wrong.

A: Well, yeah, I've heard it -- I know they done something wrong, because they took the checks without my signature.

Q: Okay. Well, besides that, has the bank done anything wrong, other than receive forged checks?

A: In my opinion, no. That's my opinion.

In short, the evidence in the record fully supports the trial court's conclusion that "plaintiff has set forth no facts that demonstrate a genuine issue that [the bank] had knowledge of any breach of Brown's fiduciary duty or had knowledge of such facts that its actions in depositing the checks amounted to bad faith." Consequently, we affirm the trial court's grant of summary judgment on plaintiff's claim based on Tenn. Code Ann. § 35-2-107. We also affirm the trial court's ruling that Tenn. Code Ann. § 35-2-109 has been repealed by implication by the UCC provision found at Tenn. Code Ann. § 47-3-307, as recognized by this Court in *C-Wood*, 233 S.W.3d at 278 ("Because Tenn. Code Ann. § 47–3–307 and Tenn. Code Ann. § 35–2–109 cannot be construed harmoniously, Tenn. Code Ann. § 47–3–307 prevails and governs all transactions occurring after its effective date").

### D. Other Claims

Plaintiff also brought claims for negligence, aiding and abetting Brown's breach of fiduciary duty, aiding and abetting breach of contract, aiding and abetting fraud, aiding and abetting Brown's alleged violation of the Tennessee Consumer Protection Act, and unjust enrichment. The *C-Wood* opinion provides the following guidance for addressing claims based on theories other than the UCC:

> The drafters of the UCC set out to preserve and, where necessary, clarify and conform the law merchant with modern commercial practice. The Code does not purport to codify the entire body of law affecting the rights and obligations of parties to commercial transactions. Thus, unless "displaced" by particular provisions of the UCC, other principles of law and equity that are consistent with the UCC remain valid.

20

Even though the UCC does not supplant all the law applicable to commercial transactions, it is still the primary source of the commercial law rules for the areas it governs because it represents the considered choices of its drafters and of the Tennessee General Assembly about the appropriate policies to be furthered in the transactions it covers. . . . [W]hile generally applicable principles of law and equity can be used to supplement the UCC, they may not be used to supplant the UCC's provisions or the purposes or policies these provisions reflect.

Courts determining whether common-law or other non-UCC claims and remedies have been displaced by the UCC have emphasized the policies favoring certainty and uniformity. Thus, the prevailing view now is that when the UCC provides a comprehensive remedy for the parties to a transaction, common-law and other non-Code claims and remedies should be barred.

Articles 3 and 4 of the UCC embody a delicately balanced statutory scheme governing the endorsement, negotiation, collection, and payment of checks. They provide discrete loss-allocation rules uniquely applicable to banks. While this scheme is not comprehensive, it is nearly so. Therefore, courts dealing with "hard cases" should be hesitant to recognize common-law or non-U.C.C. claims or to employ common-law or non-UCC remedies in the mistaken belief that they are dealing with one of the rare transactions not covered by the UCC.

The weight of the case law comes down against permitting common-law actions to displace the UCC's provisions regarding transactions governed by Articles 3 and 4. Accordingly, a large number of courts have refused to recognize common-law or non-UCC claims in general, and specifically common-law or non-UCC negligence claims or conversion claims, arising from transactions governed by Articles 3 or 4. The transactions at issue in this case fall squarely within the scope of Articles 3 and 4. Therefore, C–

21

Wood's claims against the bank and the scope of the remedies available to C–Wood are governed solely by the UCC.

*C-Wood*, 233 S.W.3d at 280-82 (internal citations and footnotes omitted). Under these principles espoused in *C-Wood*, we affirm the trial court's holding that plaintiff's non-UCC claims are unavailable in this action based on "the endorsement, negotiation, collection, and payment of checks." *Id.* at 281.

Regarding plaintiff's claim for aiding and abetting breach of contract, we affirm the trial court's holding that Tennessee law does not recognize such a claim. Plaintiff cites only one Tennessee case in his argument to the contrary. This case is designated as a memorandum opinion that has "no precedential value . . . and shall not be cited or relied on for any reason in any unrelated case." Court of Appeals Rule 10.

### E. Compensatory Damages

The trial court held that plaintiff did not demonstrate any compensatory damages in this case, stating as follows:

> Defendant established that (1) the checks at issue, which were deposited into Brown accounts at [the bank], totaled $292,853.46, and (2) the checks Plaintiff admitted to receiving, which were drawn on the BTS account at [the bank], totaled $485,000. Thus Defendant established that [the] banking transactions did not cause [plaintiff] to lose any money. Rather he received $192,146.54 more from [the bank] than he deposited. The Court determines Defendant has negated an essential element of Plaintiff's claims, that is Plaintiff was not damaged.

> Plaintiff does not dispute [the pertinent statements of undisputed material fact]. Plaintiff merely asserts that [the bank] is liable to him for all the damages he suffered as a result of Brown's Ponzi scheme arguing [the bank] facilitated the Ponzi scheme. Plaintiff cites no authority for this position. The Court concludes Defendant's motion for summary judgment on grounds that Plaintiff has not demonstrated any damages is well-taken.

22

This analysis is pertinent to the extent of showing that under the particular facts presented here, the specific transactions involving plaintiff and the bank resulted in a net gain to plaintiff, not a loss. However, this fact, standing alone, would likely not support a grant of summary judgment, *if* plaintiff had been able to present facts establishing a genuine issue of material fact to support one of his viable claims. In other words, if plaintiff had been able to point to facts raising a genuine issue regarding whether the bank had "knowledge of such facts that its action in paying the check[s] amount[ed] to bad faith," Tenn. Code Ann. § 35-2-107, he may have been able to proceed in attempting to persuade a trier of fact that the bank had such knowledge as would render it potentially liable. But as our analysis above makes clear, plaintiff did not present any such evidence here, and thus, summary judgment was correctly granted.

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, John R. Fuller. The case is remanded to the trial court for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE